**The PEOPLE OF ENEWETAK et al., Plaintiffs,**

v.

**Melvin R. LAIRD, Secretary of Defense, et al., Defendants.**

**Civ. No. 72–3649.**

United States District Court, D. Hawaii.

Jan. 19, 1973.

---

812

Theodore R. Mitchell, Edward C. King and James E. Duggan, Saipan, Mariana Islands, Dennis F. Olsen and Hamlet J. Barry, III, Micronesian Legal Services Corp., Majuro, Marshall Islands, Boyce R. Brown, Jr., Mattoch, Edmunds, Kemper & Brown, Honolulu, Hawaii, of counsel, for plaintiffs.

Jon T. Miho, Asst. U. S. Atty., District of Hawaii, Honolulu, Hawaii, for defendants.

## DECISION AND ORDER

KING, District Judge.

This suit is brought by the hereditary and elected leaders of the people of Enewetak Atoll [1] seeking a preliminary injunction against defendants Melvin R. Laird, Robert C. Seamens, Philip N.

---

[1]. Enewetak is also commonly spelled "Eniwetok." It is the westernmost atoll of the Western (Ralik) Chain of the Marshall Islands and is located north of the equator in the west-central part of the Pacific Ocean between 11° 20′ and 11° 46′ north latitudes, and 162° 02′ and 162° 24′ east longitudes. The atoll consists of a chain of forty two islands surrounding an oval lagoon 25 miles long by 20 miles wide. The total land area of the islands is 2.26 square statute miles.

Whittaker, Noel Gayler and Caroll H. Dunn. Defendants are respectively, Secretary of Defense, Secretary of the Air Force, Assistant Secretary of the Air Force, Commander in Chief of the United States Military Forces in the Pacific Ocean area and Director of the Defense Nuclear Agency. The complaint alleges that defendants have not complied with the provisions of the National Environmental Policy Act of 1969 (hereinafter "NEPA"), 42 U.S.C. § 4321 et seq. (Supp.1972), and other laws of the United States,[2] in the manner in which they initiated and conducted the Pacific Cratering Experiments (hereinafter "PACE") on Enewetak Atoll. The jurisdiction of this court is invoked under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1331 and 1361 (Supp.1972).

Prior to the hearing on plaintiffs' motion for a preliminary injunction, defendants acknowledged that the Draft Environmental Statement prepared for the PACE project and filed with the Council on Environmental Quality on April 18, 1972 (hereinafter "April 18th DES") was inadequate under NEPA, and it was agreed that a new Statement would be prepared. It was stipulated that a preliminary injunction would issue pending final determination of this action after trial on the merits; reserving, however, the question whether the scope of the injunction should preclude the defendants from continuing core drilling and seismic studies on the atoll.

This and certain questions relative to standing and jurisdiction are the only issues before the court at this time.

### Factual Background

Enewetak is a Pacific atoll administered by the United States under a "Trust Agreement" with the United Nations pertaining to the Trust Territory of the Pacific Islands, the former Japanese Mandated Islands.[3] It is the home of the plaintiffs, whose ancestors settled there long before there was any European exploration of the Pacific region. They resided on Enewetak without significant interruption until 1947 when they were moved to Ujelang Atoll by the United States so that Enewetak could be used as a nuclear test site. From that time until the voluntary nuclear test moratorium went into effect in 1958 more than thirty nuclear devices were detonated on the islets and reef ledge of the atoll including, in 1952, the world's first explosion of a hydrogen bomb.

Since their removal, the Enewetakese have repeatedly complained that Ujelang does not afford satisfactory living conditions, and pressed for permission to return to Enewetak. Complaint ¶¶ 9 and 10. On April 18, 1972, Ambassador Franklin Williams,[4] on behalf of the United States, agreed to their return by the end of calendar 1973—following the completion of certain unspecified activities then under way on the atoll. It seems clear that these activities were

2. For the most part, these additional claims involve alleged noncompliance with various regulations and orders promulgated pursuant to NEPA, namely (1) the Guidelines for Federal Agencies Under the National Environmental Policy Act (Issued by the Council on Environmental Quality), 36 Fed.Reg. 7724 (April 23, 1971), (2) The Department of Defense environmental regulations, 32 C.F.R. Part 214, (3) the Air Force environmental regulations ("Environmental Protection: Environmental Assessments and Statements," Air Force Regulation 19–2, January 20, 1972) and (4) Executive Order No. 11514, 35 Fed.Reg. 4247 (March 7, 1970). There is, however, an independent allegation based on alleged violations of the United Nations Trusteeship Agreement for the Former Japanese Mandated Islands (which Trusteeship Agreement includes Enewetak Atoll), approved by the Security Council of the United Nations on April 2, 1947, and by the United States by Joint Resolution of the Congress on July 18, 1947 (ch. 271, 61 Stat. 397). See generally, 48 U.S.C. § 1681 (Supp.1972). By agreement of the parties, none of these claims is before the court at this time.

3. See footnote 2 *supra*.

4. Special Representative of the People of the United States to the Micronesian Political Status Talks.

and are the PACE project sought to be enjoined by plaintiffs.

Approximately April 24, 1972, the plaintiffs made an aerial survey of Enewetak, and on May 17, 1972, they were allowed to visit the atoll for the first time in twenty-five years. The events that followed are not entirely clear, but it appears that plaintiffs were given a copy of the April 18th DES soon after their arrival. On the basis of this document and observations made during the visit, disputes arose between plaintiffs and the Air Force and the Nuclear Defense Agency which culminated in this suit.

According to the April 18th DES, attached as Exhibit A to the Complaint, PACE is one part of a larger program designed to provide new data on the vulnerability of certain elements of our strategic defenses to nuclear attack. Its specific purpose is to test the "cratering" effect of nuclear blasts by simulating such blasts with high explosives. Testimony at the hearing on the Order to Show Cause indicated that these detonations will range upward in size to 500 tons of high explosive.[5] In addition, large areas on the islands will be cleared of "overburden" (vegetation and topsoil) preparatory to the detonations.

The core drilling and seismic studies which defendants wish to exempt from the operation of the preliminary injunction are procedures used to gather information concerning the makeup of the subsoil and strata of the atoll and the nuclear craters located there. While this information has a general value to the scientific community, testimony at the hearing on the Order to Show Cause indicated that its primary purpose is to

further the PACE project. Indeed, it is a necessary base for planning and evaluating other phases of the project.

The core drilling involves digging holes of four to eight inches in diameter and ten to one hundred feet in depth. Approximately two hundred such holes were drilled prior to the issuance of the Temporary Restraining Order on September 22, 1972. The holes provide geologic samples for examination, and additionally some are used in the seismic studies. According to testimony at the hearing, the drill holes do not cause significant environmental damage because they fill up and disappear in a relatively short time.

The seismic studies are done in conjunction with the core drilling and involve the propagation of sound waves by the detonation of small charges of high explosives (none in excess of one fourth pound of TNT).[6] The charges are detonated in holes three feet deep and the velocity of the sound waves passing through the surrounding earth is measured by electronic equipment suspended in nearby drill holes. From this information and that obtained by the core drilling a geologist can accurately predict the geologic makeup of the area tested.

### NEPA Is Applicable To The Trust Territory

The question whether NEPA is applicable to federal action in the Trust Territory of the Pacific Islands (hereinafter "Trust Territory") and therefore to Enewetak is one of first impression for this court. Although the United States, pursuant to Article 3 of the Trusteeship Agreement with the United

---

5. Testimony at the hearing showed that PACE involves three integrated and concurrent test programs: (1) "Micro Atoll" consisting of fifteen 1,000 pound detonations of high explosives (twelve of which took place before the issuance of a temporary restraining order on September 22, 1972), three 5 ton detonations and four 20 ton detonations, (2) "Mine Throw II", a 220 ton detonation, and (3) "Coral Sands", a 500 ton detonation.

6. According to affidavits submitted by the defendants, for seismic studies such as these, the sound waves are normally produced by a hammer impacting on a metal plate placed on the surface of the ground. However, testimony at the hearing indicated that the use of small explosive charges is the usual practice on Enewetak.

Nations, has "full powers of administration, legislation, and jurisdiction," federal legislation is not automatically applicable to the Trust Territory.[7] Instead, Congress must manifest an intention to include the Trust Territory within the coverage of a given statute before the courts will apply its provisions to claims arising there. Such an intention is usually indicated by defining the term "State" or "United States" as used in the legislation to include the Trust Territory.[8] Hence a problem of statutory construction arises when a given federal statute—such as NEPA—is silent on the extent of its coverage. In such instances, the courts must find the lawmakers' intent by an investigation of the history, character and general aim of the legislation.[9]

7. See Article 3 of the Trusteeship Agreement quoted in footnote 12 *infra*.

8. For statutes in which the term "State" is defined to include the Trust Territory, see 42 U.S.C. § 4571 (Supp.1972) (Alcoholism Prevention, Treatment and Rehabilitation Program); 41 U.S.C. § 48b (Supp.1972) (Committee for the Purchase of Products and Services of the Blind and Other Severely Handicapped); 42 U.S.C. § 246 (Comprehensive Health Planning and Services); 42 U.S.C. § 247b (Supp.1972) (Communicable Disease Control Grants); 47 U.S.C. § 397 (Supp. 1972) (Construction Grants for Noncommercial Educational Broadcasting Facilities); 42 U.S.C. § 4402(3) (Supp.1972) (Disaster Relief Assistance); 42 U.S.C. § 2949 (Supp.1972) (Economic Opportunity Programs); 20 U.S.C. § 1401 (Supp.1972) (Education of the Handicapped); 42 U.S.C. § 300a (Supp.1972) (Family Planning Services); Federal Environmental Pesticide Control Act of 1972, Pub.L. 92–516, § 2(aa), in 71 Environment Rptr. 7501, 7503 (enacted by Congress October 12, 1972; signed by the President October 21, 1972) amending 7 U.S.C. § 135 et seq.; Federal Water Pollution Control Act of 1972, Pub.L. 92–500, § 502(3), 86 Stat. 816 in 71 Environment Rptr. 5101, 5125 (enacted by Congress October 18, 1972, overriding the President's Veto of October 17, 1972), 15 U.S.C. § 278g (Supp.1972) (Fire Research and Safety Program Grants); 42 U.S.C. § 299b (Supp.1972) (Heart Disease, Cancer and Related Disease Research); 22 U.S.C. § 2127 (Supp.1972) (International Travel); 42 U.S.C. § 3890 (Juvenile Delinquency Prevention and Control); 20 U.S.C. § 403 (National Defense Education Act); Noise Control Act of 1972, Pub.L. 92–574, § 3(9), in 71 Environment Rptr. 7201 (enacted by Congress October 18, 1972; signed by the President October 27, 1972); 42 U.S.C. § 298b (Nurse Training); 42 U.S.C. § 3002 (Programs for Older Americans); 20 U.S.C. § 807 (Supp.1972) (Training and Fellowship Programs for Community Development); 33 U.S.C. § 1169 (Training Grants to and Contracts with Institutions of Higher Education for Water Quality Control Programs); 42 U.S.C. § 4601 (Supp.1972) (Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs); 29 U.S.C. § 41 (Supp.1972) (Vocational Rehabilitation). For statutes in which "United States" is defined as including the Trust Territory, see 33 U.S.C. § 1163 (Control of Sewage from Vessels); 42 U.S.C. § 4402(2) (Supp.1972) (Disaster Relief Assistance); 42 U.S.C. § 2949 (Supp.1972) (Economic Opportunity Programs); 22 U.S.C. § 2127 (Supp.1972) (International Travel); Marine Protection, Research and Sanctuaries Act of 1972, Pub. L. 92–532, § 3(d), in 71 Environment Rptr. 6001 (enacted by Congress October 17, 1972; signed by the President October 23, 1972), 86 Stat. 1052; 33 U.S.C. § 1161 (Oil Pollution Prevention and Control); Ports and Waterways Safety Act of 1972, Pub.L. 92–340, § 102(a), in 71 Environment Rptr. 5941, 5942 (July 10, 1972); 15 U.S.C. § 633 (Supp.1972) (Small Business Act); 16 U.S.C. § 951 (Supp.1972) (Tuna Conventions). Additionally, there is one statutory provision specifically excluding the Trust Territory from the definition of a "State." See 20 U.S.C. § 1109 (Grants to Meet Critical Teacher Shortages).

9. Though a survey of statutes specifically applicable to the Trust Territory, see footnote 8, *supra*, fails to reveal any general pattern that could serve as a guide in the disposition of this case, the most recent federal environmental legislation identifying the areas where these laws are to be effective has—with only one exception, see Costal Zone Management Act of 1972, Pub.L. 92–583, 86 Stat. 1280, in 71 Environment Rptr. 8001 (signed by the President October 27, 1972)—included the Trust Territory. See Federal Environmental Pesticide Control Act of 1972, *supra*; Federal Water Pol-

By its own terms, NEPA is not restricted to United States territory delimited by the fifty states. In contrast to the usual practice, the term "United States" is left undefined and used only twice in the entire statute, and in both of these instances, it serves the limited purpose of identifying certain policies, regulations and public laws that would otherwise remain ambiguous. See §§ 4332(1) and 4332(2)(E). Where one would have expected "United States" to have been used, the lawmakers substituted the much broader term "Nation." For example, section 4331(b) declares that:

> . . . In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that *the Nation may* . . . . (Emphasis added.)

This substitution is even more pronounced in section 4341 which requires the President to submit to the Congress an Environmental Quality Report setting forth:

> . . . (1) the status and condition of the major natural, manmade, or altered environmental classes *of the Nation* . . . (2) current and foreseeable trends in the quality, management and utilization of such environments and the effects of those trends on the social, economic, and other requirements *of the Nation;* (3) the adequacy of available natural resources for fulfilling human and economic requirements *of the Nation* in the light of expected population pressures; (4) a review of the programs and activities (including regulatory activities)

of the Federal Government, the State and local governments, and nongovernmental entities or individuals . . . . (Emphasis added.)

See also, 42 U.S.C. §§ 4321, 4342 and 4344.

Moreover, NEPA is framed in expansive language that clearly evidences a concern for all persons subject to federal action which has a major impact on their environment—not merely United States' citizens located in the fifty states. In its declaration of purpose, for example, the Congress used the following language:

> The purposes of this chapter are: To declare a national policy which will *encourage productive and enjoyable harmony between man and his environment;* to promote efforts which will prevent or eliminate damage to the environment and biosphere and *stimulate the health and welfare of man;* to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality. (Emphasis added.) 42 U.S.C. § 4321.

And in section 4331 it is stated to be the national environmental policy, *inter alia,* that:

> (c) The Congress recognizes that *each person* should enjoy a healthful environment and that *each person* has a responsibility to contribute to the preservation and enhancement of the environment. (Emphasis added.)

Similarly broad language is found in sections 4331(a), 4331(b) and 4332. Indeed, NEPA is phrased so expansively that there appears to have been a conscious effort to avoid the use of restrictive or limiting terminology. Accordingly, the District of Columbia Circuit

lution Control Act of 1972, *supra*; Marine Protection, Research and Sanctuaries Act of 1972, *supra*; Noise Control Act of

1972, *supra*; Ports and Waterways Safety Act of 1972, *supra*.

has concluded that "[t]he sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action." Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1122 (1971).[10]

This reading of the scope of NEPA is fully supported by the legislative history of the Act. Though there is no reference to the Trust Territory *per se,* the broad language used in the text of the statute is found throughout the committee reports, hearings and debates.[11] The remarks of Senator Jackson, NEPA's principal sponsor, in submitting the Conference Committee's Report to the Senate are representative:

> What is involved is a congressional declaration that we do not intend, as a government or as a people, to initiate actions which endanger the continued existence or the health of mankind: That we will not intentionally initiate actions which will do irreparable damage to the air, land, and water which support life on earth.

> An environmental policy is a policy for people. Its primary concern is with man and his future. The basic principle of the policy is that we must strive in all that we do, to achieve a standard of excellence in man's relationships to his physical surroundings. If there are to be departures from this standard of excellence they should

be exceptions to the rule and the policy. And as exceptions, they will have to be justified in the light of public scrutiny as required by section 102 [42 U.S.C. § 4332]. 115 Cong.Rec. 40416 (1969).

Additionally, there is specific language in the committee reports indicating a Congressional intent that NEPA be broadly applied. In its discussion of the Environmental Quality Report required by section 4341, the Conference Committee stated that the Report "will set forth an up-to-date inventory of the American environment, *broadly and generally identified . . . .*" (Emphasis added.) Conf.Rep.No.91–765, in 1969 U.S.Code Cong. & Ad.News, pp. 2751, 2771. Identical language is found in the House Report. H.Rep.No.91–378, *Id.* at p. 2759.

Finally, the legislative history demonstrates that Congress clearly recognized that environmental problems are worldwide in scope. It was therefore particularly concerned about the international implications of United States actions that affect the human environment. In the House Report, for example, it is stated:

> Implicit in this section [42 U.S.C. § 4341] is the understanding that the international implications of our current activities will also be considered, inseparable as they are from the purely national consequences of our actions. H.Rep.No.91–378, *supra* at p. 2759.

---

10. Utilizing this language and that found in section 4332 which directs that "all agencies of the Federal Government" shall follow the procedural requirements of NEPA "to the fullest extent possible," the plaintiffs argue, in effect, that NEPA follows every federal agency and is applicable anywhere in the world that such an agency takes action which will significantly affect the quality of the human environment. Defendants apparently accept this argument insofar as it applies to territory governed solely by the United States, see 32 C.F.R. § 214.5(b) quoted *infra* at 819, but not as to territory under

the jurisdiction of a nation other than the United States. In accordance with the view of the case taken by this court, it is unnecessary to decide this question.

11. See generally, S.Rep.No.91–296, 91st Cong., 1st Sess. (1969); H.Rep.No.91–378, 91st Cong., 1st Sess. (1969); Conf. Rep.No.91–765, 91st Cong., 1st Sess. (1969); 115 Cong.Rec. 19008–19013, 26569–26591, 29050–29089, and 40415–40427 (1969); Hearings on S. 1075, S. 237 and S. 1752. Before Senate Committee on Interior and Insular Affairs, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News, p. 2751.

See also, 115 Cong.Rec. 40416–40417 (1969) (Remarks of Senator Jackson). Hence section 4332(2)(E) directs federal agencies to support, "where consistent with the foreign policy of the United States, . . . initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment . . . ." Cooperation is possible, according to Senator Jackson, "because the problems of the environment do not, for the most part, raise questions related to ideology, national security and the balance of world power." 115 Cong.Rec. at 40417 (1969). In view of this expressed concern with the global ramifications of federal actions, it is reasonable to conclude that the Congress intended NEPA to apply in all areas under its exclusive control. In areas like the Trust Territory there is little, if any, need for concern about conflicts with United States foreign policy or the balance of world power.

Although this court has been unable to discover any decisional law that is directly pertinent, there is a recent decision that appears to have accorded NEPA an even wider scope than that advocated by plaintiffs in this case. In Wilderness Society v. Morton, 463 F.2d 1261 (D.C.Cir. 1972), the District of Columbia Court of Appeals allowed a Canadian environmental organization to intervene in litigation aimed at testing whether the Secretary of the Interior had complied with the procedures of NEPA prior to deciding whether to issue a permit for the trans-Alaska pipeline. The Court was persuaded that existing plaintiff's counsel would not be able to adequately represent the *Canadian* environment in the proceeding. Thus *Wilderness Society* seems to hold that NEPA provides foreign nationals with certain rights when their environment is endangered by federal actions.

Even if *Wilderness Society* is limited or disavowed by subsequent decisions, the argument that Congress intended NEPA to apply to the Trust Territory remains viable. Though the peoples of the Trust Territory do not have the status of United States citizens and are resident outside the boundaries of the fifty states, they are subject to the authority of the United States. Unlike the Canadian citizens in *Wilderness Society,* the peoples of the Trust Territory do not have an independent government which can move to protect them from United States actions that are thought to be harmful to their environment. And the present suit and previous history of Enewetak demonstrate that their status as residents of an area administered by the United States exposes them to many more federal actions than would otherwise be the case.

Indeed, in the negotiation of the Trusteeship Agreement, the United States recognized that the Trust Territory occupies a special position vis-a-vis the United States. As originally proposed, the words "as an integral part of the United States" were to be included in the Trusteeship Agreement's description of the powers to be exercised by the administering authority.[12] Upon objection

12. Article 3 of the Trusteeship Agreement reads:
> The administering authority [the United States] shall have full powers of administration, legislation, and jurisdiction over the territory subject to the the provisions of this agreement, and may apply to the trust territory, subject to any modifications which the administering authority may consider desirable,

such of the laws of the United States as it may deem appropriate to local conditions and requirements.
The words "as an integral part of the United States" would have been inserted after the phrase "subject to the provisions of this agreement." See 1 Whiteman, Digest of International Law 777–778 (Released June, 1963).

by the Soviet Union, the United States Representative made the following statement to the United Nations Security Council:

. . . In employing the phrase 'as an integral part of the United States,' in article 3, my Government used the language of the original mandate and also the language used in six of the agreements recently approved by the General Assembly. It does not mean the extension of United States sovereignty over the territory, but in fact it means precisely the opposite.

There has, however, been some misunderstanding on this point and, for the sake of clarity, the United States Government is prepared to accept the amendment suggested by the Soviet Union, and to delete that phrase. In agreeing to this modification, my Government feels that for record purposes it should affirm that its authority in the trust territory is not to be considered as in any way lessened thereby. *My Government feels that it has a duty towards the peoples of the trust territory to govern them with no less consideration than it would govern any part of its sovereign territory. It feels that the laws, customs and institutions of the United States form a basis for the administration of the trust territory compatible with the spirit of the Charter. For administrative, legislative and jurisdictional convenience in carrying out its duty towards the peoples of the trust territory, the United States intends to treat the trust territory as if it were an integral part of the United States* . . . . (Emphasis added.) U.N. Security Council Off.Rec., 116th Meeting, March 7, 1947, p. 473 quoted in 1 Whiteman, Digest of International Law at 778 (Released June, 1963).

There is thus no reason to believe that Congress intended to afford the environment of the Trust Territory less protection than that provided for people and places under its jurisdiction in the fifty states.

Accordingly, it is the conclusion of this court that Congress intended to include the Trust Territory within the coverage of NEPA. Specifically, it is held that the term "Nation" as used in NEPA includes the Trust Territory, and therefore that the actions of defendants with respect to the PACE project on Enewetak Atoll must conform to the provisions of NEPA.

The court notes, in passing, that the Department of Defense apparently shares this court's view of the scope of NEPA. In its regulations promulgated pursuant to the Act, the Department has taken the following position:

. . . *Geographical location of actions.*

(1) Environmental statements are required for actions described . . . [in] this section *conducted anywhere in the world,* except when conducted in, or partly in, areas which are in or under the jurisdiction of a nation other than the United States. (Emphasis added.) 32 C.F.R. § 214.5(b).

### Plaintiffs Have Standing

The gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness will occur. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). There is no doubt that the Enewetakese have such a personal stake in the outcome of the present litigation.[13] It is their an-

13. The fact that the Enewetakese have not lived on the atoll since 1947 does not undercut their stake in this litigation in light of the Government's decision to return them by the end of 1973. Moreover, during their years of exile they have demonstrated a continuing concern with the fate of Enewetak which assures their status as adverse parties.

cestral homeland that is the site of the PACE project. No group of people are or could be more crucially affected by the federal action sought to be enjoined.[14]

### Scope of the Injunction

The remaining issue before the court is whether the scope of the preliminary injunction should preclude defendants from continuing the core drilling and seismic studies. It is argued that these activities should be exempted from the operation of the injunction because they have no appreciable effect on the environment, and because they will provide information of general value, apart from PACE, to scientists interested in the geology of coral atolls. With respect to this latter point, defendants contend that the core drilling and seismic studies really constitute a separate project lumped into the PACE program only because it was administratively convenient to do so for purposes of funding.

■ The court must reject defendants' arguments. Testimony at the hearing clearly established that the primary purpose of the core drilling and seismic studies is to further the PACE program. They are not a separate project. Moreover, the court is not persuaded that the core drilling and seismic studies will have no appreciable impact on the delicate ecology of Enewetak. The total land area of the atoll is only 2.24 square statute miles and any reduction in the amount of arable land is a serious matter. Finally, the fact that the information produced by these activities may be valuable to the scientific community is no justification for avoiding the requirements of NEPA.

■ But even assuming arguendo that the core drilling and seismic studies have no environmental impact, the court must still reject defendants' position. NEPA dictates a truly objective evaluation of the environmental factors whenever the judiciary is forced to intervene in the agency decision making process because of a failure to comply with the provisions of the statute. While such evaluation is taking place, the possibility of project modification or abandonment in light of environmental considerations can be realistically accommodated only by suspending all activity that furthers the project.

This proposition flows principally from Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), where it was held that NEPA requires each agency decision maker have before him and take into proper account "all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance." 449 F.2d at 1114. In language quoted with approval by this Circuit in Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971), Judge Wright noted the difficulty of procuring an adequate consideration of environmental factors once a project is underway:

> Once a facility has been completely constructed, the economic cost of any alteration may be very great. In the language of NEPA, there is likely to be an 'irreversible and irretrievable commitment of resources,' which will inevitably restrict the Commission's options. Either the licensee will have to undergo a major expense in making

14. The fact that the Enewetakese are non-resident aliens does not detract from their standing to sue in view of this court's conclusion that NEPA is applicable to the Trust Territory. While it is true that non-resident aliens are denied standing in situations where the statute involved evinces such an intent—as in immigration disputes, see Braude v. Wirtz, 350 F.2d 702 (9th Cir. 1965)— no such intent is apparent in NEPA.

The term "citizen" is not used in the statute and the Administrative Procedure Act, one avenue upon which judicial review is based, is phrased in terms of "any person," not "any citizen." See 5 U.S.C. § 702. See also, Wilderness Society v. Morton, supra N. 2 at 1262; Constructores Civiles de Centroamerica, S.A. v. Hannah, 459 F.2d 1183 (D.C. Cir. 1972).

alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass. 449 F.2d at 1128.

It follows that in order to insure that federal agencies do in fact give proper weight to ecological factors in the decision making process, there must be a severe limitation on the scope of all activity that furthers the project.[15] Otherwise, the impact statement may become merely a "progress report" filed sometime prior to the completion of the project. See Stop H-3 Assoc. v. Volpe, 349 F.Supp. 1047 (D.Hawaii 1972). See Judge Wright's discussion of the "strict standard of compliance" mandated by the procedural provisions of NEPA in Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, *supra* 449 F.2d at 1112-1116.

■ If the court adopted the rule advanced by defendants and considered the specific environmental impact of each segment of the project, much of the force of NEPA would be undercut. Almost every project can be divided into smaller parts, some of which might not have any appreciable effect on the environment. The court would be forced to take each project apart piece by piece, hole by hole and explosion by explosion. Work allowed to proceed because it does not have a specific environmental impact would increase the government's "stake" in the project and thereby influence the decision making process when it is time to reevaluate the project in light of the environmental considerations.

For these reasons the court rejected similar arguments in the *Stop H-3 Association* case, *supra,* and does so again in this case. The test is whether the primary purpose of the activity is to further the project which has been enjoined. If so, and defendants are unable to show any irreparable injury that will result as a consequence of not being allowed to go forward, then the activity must be enjoined. While this will necessarily result in delay if the project is eventually approved, "[d]elay is a concomitant of the implementation of the procedures prescribed by NEPA . . . ." Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 422 (2d Cir. 1972). "It is far more consistent with the purposes of [NEPA] to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible." Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, *supra* 449 F.2d at 1128.

Therefore, this court having found that the primary purpose of the core drilling and seismic studies is to further the PACE project, and defendants failing to show any irreparable injury that will result to them, it is ordered that these activities be enjoined pending trial on the merits.

This Decision and Order shall constitute the court's findings of fact and conclusions of law as authorized by Rule 52 of the Federal Rules of Civil Procedure.

15. Cases in which similar activity has been enjoined pending formulation and approval of the environmental impact statement include: Arlington Coalition On Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972) ; Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) ; Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972) ; Keith v. Volpe, 352 F.Supp. 1324 (C.D. Cal.1972) ; La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971) ; Ward v. Ackroyd, 344 F.Supp. 1202 (D.Md. 1972) ; Northside Tenants Rights Coalition v. Volpe, 346 F.Supp. 244 (D.Wis. 1972) ; Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Or.1971) ; Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806 (E.D.Tenn.1972) ; Stop H-3 Assoc. v. Volpe, 349 F.Supp. 1047 (D.Hawaii 1972).