986 F.2d 528
 36 ERC 1053, 300 U.S.App.D.C. 65, 61
USLW 2490,
23 Envtl. L. Rep. 20,601
 ENVIRONMENTAL DEFENSE FUND, INC., a Non-Profit Corporation, Appellant,
v.
Walter E. MASSEY, in his Official Capacity as Director,
National Science Foundation, and National Science
Foundation, Appellees.
 No. 91-5278.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 14, 1992.
Decided Jan. 29, 1993.
 
 Appeal from the United States District Court for the District of Columbia Civ. No. 91-1068.
 Bruce S. Manheim, Jr., Washington, D.C., was on the brief, for the appellant.
 J. Carol Williams, Atty., Dept. of Justice, with whom John A. Bryson, Washington, D.C., was on the brief, for the appellees.
 Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Chief Judge MIKVA.
 MIKVA, Chief Judge:
 
 
 1
 The Environmental Defense Fund ("EDF") appeals the district court's order dismissing its action seeking declaratory and injunctive relief under the National Environmental Policy Act ("NEPA"). EDF alleges that the National Science Foundation ("NSF") violated NEPA by failing to prepare an environmental impact statement ("EIS") in accordance with Section 102(2)(C) before going forward with plans to incinerate food wastes in Antarctica. The district court dismissed EDF's action for lack of subject matter jurisdiction. The court explained that while Congress utilized broad language in NEPA, the statute nevertheless did not contain "a clear expression of legislative intent through a plain statement of extraterritorial statutory effect;" consequently, the court was compelled by the recent Supreme Court decision in Equal Employment Opportunity Commission v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("Aramco" ) to conclude that NEPA does not apply to NSF's decision to incinerate food wastes in Antarctica. See Environmental Defense Fund, Inc. v. Massey, 772 F.Supp. 1296, 1297 (D.D.C.1991).
 
 
 2
 We reverse the district court's decision, and hold that the presumption against the extraterritorial application of statutes described in Aramco does not apply where the conduct regulated by the statute occurs primarily, if not exclusively, in the United States, and the alleged extraterritorial effect of the statute will be felt in Antarctica--a continent without a sovereign, and an area over which the United States has a great measure of legislative control. We therefore remand to the district court for a determination of whether NSF actually failed to comply with Section 102(2)(C) of NEPA, as EDF alleges in its complaint.
 
 I.
 
 3
 As both parties readily acknowledge, Antarctica is not only a unique continent, but somewhat of an international anomaly. Antarctica is the only continent on earth which has never been, and is not now, subject to the sovereign rule of any nation. Since entry into force of the Antarctic Treaty in 1961, the United States and 39 other nations have agreed not to assert any territorial claims to the continent or to establish rights of sovereignty there. See The Antarctica Treaty, 12 U.S.T. 794 (Dec. 1, 1959). Hence, Antarctica is generally considered to be a "global common" and frequently analogized to outer space. See Beattie v. United States, 756 F.2d 91, 99 (D.C.Cir.1984).
 
 
 4
 Under the auspices of the United States Antarctica Program, NSF operates the McMurdo Station research facility in Antarctica. McMurdo Station is one of three year-round installations that the United States has established in Antarctica, and over which NSF exercises exclusive control. All of the installations serve as platforms or logistic centers for U.S. scientific research; McMurdo Station is the largest of the three, with more than 100 buildings and a summer population of approximately 1200.
 
 
 5
 Over the years, NSF has burned food wastes at McMurdo Station in an open landfill as a means of disposal. In early 1991, NSF decided to improve its environmental practices in Antarctica by halting its practice of burning food wastes in the open by October, 1991. After discovering asbestos in the landfill, however, NSF decided to cease open burning in the landfill even earlier, and to develop quickly an alternative plan for disposal of its food waste. NSF stored the waste at McMurdo Station from February, 1991 to July, 1991, but subsequently decided to resume incineration in an "interim incinerator" until a state-of-the-art incinerator could be delivered to McMurdo Station. EDF contends that the planned incineration may produce highly toxic pollutants which could be hazardous to the environment, and that NSF failed to consider fully the consequences of its decision to resume incineration as required by the decisionmaking process established by NEPA.
 
 
 6
 Section 102(2)(C) of NEPA requires "all federal agencies" to prepare an EIS in connection with any proposal for a "major action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS requirement, along with the many other provisions in the statute, is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Following the passage of NEPA, NSF promulgated regulations applying the EIS requirement to its decisions regarding proposed actions in Antarctica. See 29 Fed.Reg. 3544, 3547 (Jan. 28, 1974) (codified at 45 C.F.R. § 640.3(e) (1977)). Since the issuance of Executive Order 12114, however, NSF has contended that proposed action affecting the environment in Antarctica is governed by the Executive Order, not NEPA. See Exec.Order 12114, 3 C.F.R. 356 (1980) [hereinafter cited as E.O. 12114].
 
 
 7
 Executive Order 12114 declares that federal agencies are required to prepare environmental analyses for "major Federal actions significantly affecting the environment of the global commons outside the jurisdiction of any nation (e.g., the oceans or Antarctica)." E.O. 12114 § 2-3(a). According to the Executive Order, major federal actions significantly affecting the environment of foreign countries may also require environmental analyses under certain circumstances. Id. Although the procedural requirements imposed by the Executive Order are analogous to those under NEPA, the Executive Order does not provide a cause of action to a plaintiff seeking agency compliance with the EIS requirement. The Executive Order explicitly states that the requirements contained therein are "solely for the purpose of establishing internal procedures for Federal agencies ... and nothing in [the Order] shall be construed to create a cause of action." E.O. 12114 § 3-1. Thus, what is at stake in this litigation is whether a federal agency may decide to take actions significantly affecting the human environment in Antarctica without complying with NEPA and without being subject to judicial review.
 
 II.
 
 8
 A. The Presumption Against Extraterritoriality
 
 
 9
 As the district court correctly noted, the Supreme Court recently reaffirmed the general presumption against the extraterritorial application of statutes in Equal Employment Opportunity Commission v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("Aramco" ). Extraterritoriality is essentially, and in common sense, a jurisdictional concept concerning the authority of a nation to adjudicate the rights of particular parties and to establish the norms of conduct applicable to events or persons outside its borders. More specifically, the extraterritoriality principle provides that "[r]ules of the United States statutory law, whether prescribed by federal or state authority, apply only to conduct occurring within, or having effect within, the territory of the United States." RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 38 (1965) [hereinafter RESTATEMENT (SECOND) ]; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 403, Com. (g) (1987) [hereinafter RESTATEMENT (THIRD) ]. As stated by the Supreme Court in Aramco, the primary purpose of this presumption against extraterritoriality is "to protect against the unintended clashes between our laws and those of other nations which could result in international discord." Aramco, --- U.S. at ----, 111 S.Ct. at 1230.
 
 
 10
 An early example of the application of the extraterritoriality principle is American Banana Co. v. United States Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). In that case, the plaintiff alleged that the defendant, a U.S. corporation, had violated United States antitrust laws by inducing a foreign government to take actions within its own territory which were adverse to the plaintiff's business. The Supreme Court refused, in the absence of a clear statement of extraterritorial scope, to infer congressional intent to apply the federal statute to the conduct of a foreign government because enforcement would have interfered with the exercise of foreign sovereignty.
 
 
 11
 Similarly, in Foley Bros. v. Filardo, 336 U.S. 281, 282, 69 S.Ct. 575, 576, 93 L.Ed. 680 (1949), the Supreme Court declined to give extraterritorial effect to the Eight Hour Law, a labor statute applying to "[e]very contract made to which the United States ... is a party." The Court recognized that extraterritorial application of the statute would have "extend[ed] its coverage beyond places over which the United States has sovereignty or has some measure of legislative control," and therefore held that the intention "to regulate labor conditions, which are the primary concern of a foreign country, should not be attributed to Congress in the absence of a clearly expressed purpose." Id. at 285-286, 69 S.Ct. at 578.
 
 
 12
 Most recently, in Aramco, the Supreme Court held that Title VII of the 1964 Civil Rights Act does not apply extraterritorially to regulate the employment practices of United States firms that employ American citizens abroad. Aramco, --- U.S. at ----, 111 S.Ct. at 1236. In that case, the discriminatory conduct that allegedly violated Title VII occurred within the jurisdiction of another sovereign, although perpetrated by a U.S. firm. Since the petitioners were advancing a construction of Title VII that would logically result in the statute's application to foreign as well as American employers, the Court held that the presumption against extraterritoriality was necessary to avoid the inevitable clash between foreign and domestic employment laws. Id. --- U.S. at ----, 111 S.Ct. at 1234.
 
 
 13
 There are at least three general categories of cases for which the presumption against the extraterritorial application of statutes clearly does not apply. First, as made explicit in Aramco, the presumption will not apply where there is an "affirmative intention of the Congress clearly expressed" to extend the scope of the statute to conduct occurring within other sovereign nations. Id. --- U.S. at ----, 111 S.Ct. at 1230 (quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)).
 
 
 14
 Second, the presumption is generally not applied where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States. Two prime examples of this exception are the Sherman Anti-Trust Act, 15 U.S.C. §§ 1-7 (1976), and the Lanham Trade-Mark Act, 15 U.S.C. § 1051 et seq. (1976), which have both been applied extraterritorially where the failure to extend the statute's reach would have negative economic consequences within the United States. See, e.g., Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (Lanham Trade-Mark Act applies extraterritorially when defendant is a United States national); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.1945) (applying U.S. antitrust laws extraterritorially); Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 925 (D.C.Cir.1984) ("[j]urisdiction exists under United States antitrust laws whenever conduct is intended to, and results in, substantial effects within the United States"); see also Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir.1968) (securities laws apply extraterritorially when necessary to protect American investors).
 
 
 15
 Finally, the presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States. By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States. See generally Laker Airways, _731 F.2d at 921; RESTATEMENT (SECOND) § 38 (rules of U.S. statutory law apply "to conduct occurring within, or having effect within the territory of the United States"); RESTATEMENT (SECOND) § 17 (1965); RESTATEMENT (THIRD) § 492(1)(a), (b) (1987).
 
 
 16
 Despite these well-established exceptions to the presumption against extraterritoriality, the district court below bypassed the threshold question of whether the application of NEPA to agency actions in Antarctica presents an extraterritoriality problem at all. In particular, the court failed to determine whether the statute seeks to regulate conduct in the United States or in another sovereign country. It also declined to consider whether NEPA would create a potential for "clashes between our laws and those of other nations" if it was applied to the decisionmaking of federal agencies regarding proposed actions in Antarctica. Aramco, --- U.S. at ----, 111 S.Ct. at 1230. After a thorough review of these relevant factors, we conclude that this case does not present an issue of extraterritoriality.
 
 B. Regulated Conduct Under NEPA
 
 17
 NEPA is designed to control the decisionmaking process of U.S. federal agencies, not the substance of agency decisions. By enacting NEPA, Congress exercised its statutory authority to determine the factors an agency must consider when exercising its discretion, and created a process whereby American officials, while acting within the United States, can reach enlightened policy decisions by taking into account environmental effects. In our view, such regulation of U.S. federal agencies and their decisionmaking processes is a legitimate exercise of Congress' territoriality-based jurisdiction, and does not raise extraterritoriality concerns.
 
 
 18
 Section 102(2)(C) lies at the heart of NEPA and is often considered the "action-forcing" element of the statute. See S.REP. No. 91-296, 91st Cong., 1st Sess. 19 (1969); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). This section requires "all agencies of the Federal Government" to prepare a detailed environmental impact statement for every "major Federal action[ ]" which has the potential to significantly affect the human environment. 42 U.S.C. § 4332(2)(C). Section 102(2)(C) binds only American officials and controls the very essence of the government function: decisionmaking. Because the decisionmaking processes of federal agencies take place almost exclusively in this country and involve the workings of the United States government, they are uniquely domestic. See Mary A. McDougall, Extraterritoriality and the Endangered Species Act of 1973, 80 GEO. L. J . 435, 445 (1991).
 
 
 19
 NEPA, unlike many environmental statutes, does not dictate agency policy or determine the fate of contemplated action. Robertson, 490 U.S. at 350, 109 S.Ct. at 1845; Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-228, 100 S.Ct. 497, 499-500, 62 L.Ed.2d 433 (1980) (per curiam). NEPA simply mandates a particular process that must be followed by a federal agency before taking action significantly affecting the human environment. After weighing environmental considerations, an agency decisionmaker remains free to subordinate the environmental concerns revealed in the EIS to other policy concerns. Robertson, 490 U.S. at 350, 109 S.Ct. at 1845. As this Court observed almost two decades ago,
 
 
 20
 [t]he harm against which NEPA's impact statement requirement was directed was not solely or even primarily adverse consequences to the environment; such consequences may ensue despite the fullest compliance. Rather NEPA was intended to ensure that decisions about federal actions would be made only after responsible decisionmakers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs.
 
 
 21
 Jones v. District of Columbia Redevelopment Land Agency, 499 F.2d 502, 512 (D.C.Cir.1974), cert. denied, 432 U.S. 937 (1975).
 
 
 22
 In many respects, NEPA is most closely akin to the myriad laws directing federal decisionmakers to consider particular factors before extending aid or engaging in certain types of trade. See Comment, NEPA's Role in Protecting the World Environment, 131 U. PA.L.REV. 353, 371 (1982). For example, the Foreign Assistance Act of 1961 requires the Agency for International Development, before approving developmental assistance, to consider the degree to which programs integrate women into the economy, as well as the possibility of using aid to "support democratic and social political trends in recipient countries." 22 U.S.C. §§ 2151k, 2218(c) (1976). Similarly, the Nuclear Nonproliferation Act requires the Nuclear Regulatory Commission to consider a nation's willingness to cooperate with American nonproliferation objectives before approving a nuclear export license. 22 U.S.C. §§ 3201-3282 (1976); 42 U.S.C. §§ 2156, 2157 (Supp. III 1979). Just as these statutes fall short of prescribing action in foreign jurisdictions, and are instead directed at the regulation of agency decisionmaking, NEPA also creates no substantive environmental standards and simply prescribes by statute the factors an agency must consider when exercising its discretionary authority.
 
 
 23
 Moreover, NEPA would never require enforcement in a foreign forum or involve "choice of law" dilemmas. This factor alone is powerful evidence of the statute's domestic nature, and distinguishes NEPA from Title VII as well as the Federal Tort Claims Act--two statutes that have been limited in their effect by the presumption against extraterritoriality. See Aramco, --- U.S. at ----, 111 S.Ct. at 1234 (presumption against extraterritoriality applies where Congress failed to provide for overseas enforcement and failed to address the potential conflicts of law issue); Smith v. United States, 932 F.2d 791, 793 (9th Cir.1991) (an "indication that the [statute] was not intended to apply to Antarctica is the choice of law problem"), cert. granted --- U.S. ----, 112 S.Ct. 2963, 119 L.Ed.2d 585 (1992).
 
 
 24
 In sum, since NEPA is designed to regulate conduct occurring within the territory of the United States, and imposes no substantive requirements which could be interpreted to govern conduct abroad, the presumption against extraterritoriality does not apply to this case.
 
 C. The Unique Status of Antarctica
 
 25
 Antarctica's unique status in the international arena further supports our conclusion that this case does not implicate the presumption against extraterritoriality. The Supreme Court explicitly stated in Aramco that when applying the presumption against extraterritoriality, courts should look to see if there is any indication that Congress intended to extend the statute's coverage "beyond places over which the United States has sovereignty or some measure of legislative control." Aramco, --- U.S. at ----, 111 S.Ct. at 1230, (quoting Foley Bros., 336 U.S. at 285, 69 S.Ct. at 577 (emphasis added)). Thus, where the U.S. has some real measure of legislative control over the region at issue, the presumption against extraterritoriality is much weaker. See, e.g., Sierra Club v. Adams, 578 F.2d 389 (D.C.Cir.1978) (NEPA assumed to be applicable to South American highway construction where the United States had two-thirds of the ongoing financial responsibility and control over the highway construction); People of Enewetak v. Laird, 353 F.Supp. 811 (D.Hawaii 1973) (concluding that NEPA applies to the United States trust territories in the Pacific). And where there is no potential for conflict "between our laws and those of other nations," the purpose behind the presumption is eviscerated, and the presumption against extraterritoriality applies with significantly less force. Aramco, --- U.S. at ----, 111 S.Ct. at 1230.
 
 
 26
 Indeed, it was the general understanding that Antarctica "is not a foreign country," but rather a continent that is most frequently analogized to outer space, that led this Court to conclude in Beattie v. United States, 756 F.2d 91 (D.C.Cir.1984), that the presumption against extraterritoriality should not apply to cases arising in Antarctica. But cf. Smith v. United States, 932 F.2d 791 (9th Cir.1991). The Beattie Court noted that Antarctica is not a "country" at all, as it has no sovereign, and stated that "to the extent that there is any assertion of governmental authority in Antarctica, it appears to be predominately that of the United States." Beattie, 756 F.2d at 99.
 
 
 27
 Even aside from this Court's holding in Beattie, it cannot be seriously suggested that the United States lacks some real measure of legislative control over Antarctica. The United States controls all air transportation to Antarctica and conducts all search and rescue operations there. Moreover, the United States has exclusive legislative control over McMurdo Station and the other research installations established there by the United States Antarctica Program. This legislative control, taken together with the status of Antarctica as a sovereignless continent, compels the conclusion that the presumption against extraterritoriality is particularly inappropriate under the circumstances presented in this case. As stated aptly by a State Department official in congressional testimony shortly following the enactment of NEPA,
 
 
 28
 application of [NEPA] to actions occurring outside the jurisdiction of any State, including the United States, would not conflict with the primary purpose underlying this venerable rule of interpretation--to avoid ill-will and conflict between nations arising out of one nation's encroachments upon another's sovereignty.... There are at least three general areas: The high seas, outer space, and Antarctica.
 
 
 29
 See Memorandum of C. Herter, Special Assistant to the Secretary of State for Environmental Affairs, reprinted in Administration of the National Environmental Policy Act: Hearing Before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, 91st Cong., 2d Sess. 551 (1970) [hereinafter cited as State Dept. Memo].
 
 
 30
 While the State Department memo is hardly a part of appropriate legislative history, and is not entitled to any particular deference, the memo does reflect the general understanding by those intimately involved in the creation and execution of U.S. foreign policy that the global commons, including Antarctica, do not present the challenges inherent in relations between sovereign nations. Thus, in a sovereignless region like Antarctica, where the United States has exercised a great measure of legislative control, the presumption against extraterritoriality has little relevance and a dubious basis for its application.
 
 D. Foreign Policy Considerations
 
 31
 Although NSF concedes that NEPA only seeks to regulate the decisionmaking process of federal agencies, and that this case does not present a conflict between U.S. and foreign sovereign law, NSF still contends that the presumption against extraterritoriality controls this case. In particular, NSF argues that the EIS requirement will interfere with U.S. efforts to work cooperatively with other nations toward solutions to environmental problems in Antarctica. In NSF's view, joint research and cooperative environmental assessment would be "placed at risk of NEPA injunctions, making the U.S. a doubtful partner for future international cooperation in Antarctica." Appellee's Brief at 45.
 
 
 32
 NSF also argues that the Protocol on Environmental Protection to the Antarctic Treaty, which was adopted and opened for signature on October 4, 1991, would, if adopted by all the proposed signatories, conflict with the procedural requirements adopted by Congress for the decisionmaking of federal agencies under NEPA. See Protocol on Environmental Protection to the Antarctic Treaty, with Annexes, XI ATSCM, reprinted in 30 Int'l Legal Materials 1461 (1991). According to NSF, since NEPA requires the preparation of an EIS for actions with potentially "significant" impacts, while the Protocol requires an environmental analysis even for actions with "minor or transitory" impacts on the Antarctic environment, the two regulatory schemes are incompatible and will result in international discord.
 
 
 33
 We find these arguments unpersuasive. First, it should be noted that the Protocol is not in effect in any form and is years away from ratification by the United States and all 26 signatories. Second, we are unable to comprehend the difficulty presented by the two standards of review. It is clear that NSF will have to perform fewer studies under NEPA than under the Protocol, and where an EIS is required under NEPA, it would not strain a researcher's intellect to indicate in a single document how the environmental impact of the proposed action is more than "minor" and also more than "significant."
 
 
 34
 More importantly, we are not convinced that NSF's ability to cooperate with other nations in Antarctica in accordance with U.S. foreign policy will be hampered by NEPA injunctions. We made clear in Natural Resources Defense Council v. Nuclear Regulatory Commission, 647 F.2d 1345, 1366 (D.C.Cir.1981) ("NRDC "), that where the EIS requirement proves to be incompatible with Section 102(2)(F), federal agencies will not be subject to injunctions forcing compliance with Section 102(2)(C). Section 102(2)(F) specifically requires all federal agencies to
 
 
 35
 recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation ...
 
 
 36
 42 U.S.C. § 4332(F). While there was no majority opinion in NRDC, Judge Wilkey, writing for the Court, concluded that because U.S. foreign policy interests in the area of nuclear exportation were unique and delicate, the EIS requirement had to give way to the explicit directive in Section 102(2)(F) requiring agencies to cooperate with other nations where consistent with U.S. foreign policy. NRDC, 647 F.2d at 1348. Judge Robinson, in his concurrence, echoed this theme in many respects, and noted that the EIS requirement did not actually present an issue of extraterritoriality since "the licensing procedure takes place entirely within the United States, and domestic law completely expends its force then and there." Id. at 1384 n. 138.
 
 
 37
 NRDC was not the first case to hold that NEPA's EIS requirement must yield where overriding policy concerns are present. In Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 796 (D.C.Cir.1971), for example, we refused to issue an injunction under NEPA, despite the real potential for significant harm to the environment, because the government made "assertions of harm to national security and foreign policy." Id. at 798. In that case, conservation groups sought to enjoin an underground nuclear test on the grounds that the Atomic Energy Commission failed to comply fully with NEPA. Although there was reason to believe that the petitioners would succeed on the merits of their claim, we denied the requested injunction in light of the foreign policy concerns.
 
 
 38
 NRDC and Seaborg illustrate that the government may avoid the EIS requirement where U.S. foreign policy interests outweigh the benefits derived from preparing an EIS. Since NEPA imposes no substantive requirements, U.S. foreign policy interests in Antarctica will rarely be threatened, except perhaps where the time required to prepare an EIS would itself threaten international cooperation, see Flint Ridge Development Co. v. Scenic Rivers Association, 426 U.S. 776, 791, 96 S.Ct. 2430, 2439, 49 L.Ed.2d 205 (1976) (EIS requirement must yield where a clear conflict in statutory authority is unavoidable, including conflicts which arise out of timetables imposed by statute), or where the foreign policy interests at stake are particularly unique and delicate. See NRDC, 647 F.2d at 1348. Thus, contrary to NSF's assertions, where U.S. foreign policy interests outweigh the benefits of the EIS requirement, NSF's efforts to cooperate with foreign governments regarding environmental practices in Antarctica will not be frustrated by forced compliance with NEPA.
 
 E. NEPA's Plain Language and Interpretation
 
 39
 NSF's final argument is that even if the presumption against extraterritoriality does not apply to this case, the plain language of Section 102(2)(C) precludes its application to NSF's decisionmaking regarding proposed agency action in Antarctica. We read the plain language differently.
 
 
 40
 Section 102(2)(C), on its face, is clearly not limited to actions of federal agencies that have significant environmental effects within U.S. borders. This Court has repeatedly taken note of the sweeping scope of NEPA and the EIS requirement. See, e.g., Calvert Cliffs' Coord. Comm. v. United States A.E. Com'n, 449 F.2d 1109, 1122 (D.C.Cir.1971) ("[T]he sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action."); City of Los Angeles v. NHTSA, 912 F.2d 478, 491 (D.C.Cir.1990) ("[NEPA] was designed explicitly to take account of impending as well as present crises in this country and in the world as a whole.") (emphasis added).
 
 
 41
 Far from employing limiting language, Section 2 states that NEPA is intended to "encourage productive and enjoyable harmony between man and his environment " as well as to "promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321 (emphasis added). Clearly, Congress painted with a far greater brush than NSF is willing to apply. As stated by the Enewetak court, "there appears to have been a conscious effort to avoid the use of restrictive or limiting terminology." Enewetak, 353 F.Supp. at 816.
 
 
 42
 Section 102(2)(F) further supports the conclusion that Congress, when enacting NEPA, was concerned with worldwide as well as domestic problems facing the environment. 42 U.S.C. § 4332(2)(F) (federal agencies required to "recognize the worldwide and long-range character of environmental problems"). NSF acknowledges that Section 102(2)(F) clearly addresses international environmental problems, but argues that this section announces Congress' only requirement for agencies pursuing action in the international arena.
 
 
 43
 We find nothing in the statute which supports the construction of Section 102 urged by NSF. Apparently, NSF has chosen to ignore the clear interrelationship between the Section 102 subsections and the Section 102 mandate as a whole. Section 102 lists several requirements under NEPA for "all Federal agencies." 42 U.S.C. § 4332(2). Compliance with one of the subsections can hardly be construed to relieve the agency from its duty to fulfill the obligations articulated in other subsections. For example, compliance with Section 102(2)(G), which requires agencies to make environmental information available to the states, does not excuse an agency from preparing an EIS under Section 102(2)(C).
 
 
 44
 We also note, that prior to the issuance of Executive Order 12114, the Council on Environment Quality ("CEQ") maintained that NEPA applies to the decisionmaking process of federal agencies regarding actions in Antarctica. CEQ is the agency created by Congress to oversee the implementation of NEPA, and its interpretation of that statute is generally entitled to "substantial deference." See, e.g., Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). NSF contends that CEQ changed its mind after the issuance of the Executive Order, and therefore its interpretation of NEPA is not entitled to deference. Whether or not NSF is right about CEQ's change of heart, we find CEQ's original conclusion to be not only reasonable, but fully supported by the plain language of the statute.
 
 CONCLUSION
 
 45
 Applying the presumption against extraterritoriality here would result in a federal agency being allowed to undertake actions significantly affecting the human environment in Antarctica, an area over which the United States has substantial interest and authority, without ever being held accountable for its failure to comply with the decisionmaking procedures instituted by Congress--even though such accountability, if it was enforced, would result in no conflict with foreign law or threat to foreign policy. NSF has provided no support for its proposition that conduct occurring within the United States is rendered exempt from otherwise applicable statutes merely because the effects of its compliance would be felt in the global commons. We therefore reverse the district court's decision, and remand for a determination of whether the environmental analyses performed by NSF, prior to its decision to resume incineration, failed to comply with Section 102(2)(C) of NEPA.
 
 
 46
 We find it important to note, however, that we do not decide today how NEPA might apply to actions in a case involving an actual foreign sovereign or how other U.S. statutes might apply to Antarctica. We only hold that the alleged failure of NSF to comply with NEPA before resuming incineration in Antarctica does not implicate the presumption against extraterritoriality.
 
 
 47
 Reversed and remanded.