BORN FREE USA, et al., Plaintiffs,

v.

Gale NORTON, Secretary, Department
of the Interior, et al., Defendants,

and

The Zoological Society of San Diego,
et al., Intervenor–Defendants.

No. Civ.A.03–1497 JDB.

United States District Court,
District of Columbia.

Aug. 8, 2003.

Katherine A. Meyer, Meyer & Glitzen-stein, Washington, DC, for Plaintiffs.

Teresa Patrick, Wayne Douglas Hetten-bach, Department of Justice, Ann D. Na-varo, U.S. Department of Justice, Natural Resources Division/Litigation, Washington, DC, for Defendants.

James Craig Potter, Gary Charles Adler, George J. Mannina, Jr., O'Connor & Hannan, LLP, Washington, DC, for Inter-venor–Defendants.

### MEMORANDUM OPINION

BATES, District Judge.

Plaintiffs, who include several organizations and two individuals interested in the welfare of elephants, bring this case against the United States Department of the Interior and the Fish and Wildlife Service ("FWS") (collectively, the "federal defendants"), challenging FWS's decision to issue permits to the San Diego Zoo and the Lowry Park Zoo (collectively, the "zoos") for the importation of eleven African elephants from Swaziland. Presently before the Court is plaintiffs' motion for a preliminary injunction to prevent the import of the elephants until this Court reaches a final determination on the merits. Although the expedited briefing on plaintiffs' motion was completed only on August 6, 2003, the parties require a decision on the motion for a preliminary injunction by today, August 8, because the zoos, who have intervened as defendants, represent that it is imperative that the process to import the elephants commence immediately, before the beginning of Swaziland's rainy season. This case raises novel issues and evokes considerable emotion—in part because the record supports the conclusion that if the elephants are not exported to these zoos promptly, they will be killed. For the reasons set forth below, the motion for a preliminary injunction is denied.

### II. Factual and Procedural Background

The Court will only briefly summarize the relevant background. In 1987 and 1994, the Kingdom of Swaziland imported African elephants from Kruger National Park in South Africa as part of an effort to reintroduce the species to Swaziland after a hiatus of several decades. The elephants have since been located within the Hlane and Mkhaya reserves in Swaziland. Both reserves are managed by Terence "Ted" Reilly, who is the government official responsible for managing Swaziland's threatened and endangered big game.

The population of elephants within the Hlane and Mkhaya reserves has now grown to approximately 30 adults plus six calves. Mr. Reilly, as the head of the reserves, has become concerned about impacts upon biodiversity as a result of the elephant population. Elephants can severely deplete vegetation, cause significant damage to trees that are the homes to certain species of birds, and compete for resources with the black rhinoceroses located in the reserves, which are even more endangered than the elephants. Mr. Reilly, on behalf of Swaziland, has determined that the removal of eleven elephants is required in order to maintain a biologically diverse ecosystem within the reserves. Mr. Reilly has further stated unequivocally that if he is unable to export the elephants now, he will cull them—i.e., kill them.

The San Diego Zoo, in California, and Lowry Park Zoo, in Tampa, Florida, have made arrangements to import eleven elephants from Swaziland. The zoos will pay approximately $133,000 for the elephants, which they will use not just for display but also in an attempt to revive captive breeding. Zoos have historically had difficulty breeding captive elephants, and the elephant population in the United States is declining; the San Diego and Lowry Park Zoos hope that the import of wild captured elephants that have already established some social bonds will allow for more successful breeding and will also increase the genetic diversity of the U.S. captive elephant population. The zoos have already made and will continue to make considerable efforts to provide expanded and improved areas for housing the elephants. Swaziland, for its part, intends to use the proceeds from the elephant sale to enhance anti-poaching protections and expand available habitat for the remaining elephants.

Under the Convention on International Trade In Endangered Species ("CITES"), T.I.A.S. No. 8249 (1973), and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, zoos seeking to import African elephants, which are protected as a threatened species on "Appendix I" under CITES, must apply to FWS for a permit. The zoos here first applied to FWS for permits in June 2002. Import permits were issued to each zoo in September 2002. Export permits have been issued by Swaziland as also required under CITES. *See* CITES, T.I.A.S. No. 8249, Art. III, ¶ 2.

In March 2003, counsel for plaintiffs wrote to FWS that the zoos had misrepresented certain information in their permit applications, such as the specific locations of the elephants within Swaziland. Plaintiffs thereafter filed suit in this Court to halt the import of the elephants. That suit was dismissed by joint stipulation when the zoos agreed to return their permits on April 24, 2003. The zoos then provided additional information requested by FWS in response to concerns raised by plaintiffs and sought permit reissuance.

In connection with the zoos' new permit applications, FWS made certain findings required under CITES and ESA, and issued an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* On July 11, 2003, FWS reissued the import permits to the zoos. Plaintiffs filed the complaint in this case on July 10, 2003, and on July 18, 2003, moved for a preliminary injunction to stop the importation.

Plaintiffs' complaint asserts a number of claims against the U.S. Department of Interior and FWS under CITES, the ESA, and NEPA. Plaintiffs' amended complaint, filed only a few days ago, asserts additional ESA claims against the zoos, which appear as intervenor-defendants in this action. Through their preliminary injunction request, plaintiffs seek to enjoin the issuance of the permits by the federal defendants, which under CITES would effectively halt the importation. The procedural vehicle for plaintiffs' claims against the federal defendants is the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which requires the Court to determine whether an agency action—here, issuance of the import permits—is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

An important consideration for the preliminary injunction is the anticipated disposition of the elephants in the event a preliminary injunction were granted. The elephants are currently located in a

"boma" or corral, where they have been awaiting export to the zoos for several months. Mr. Reilly has submitted an affidavit that states that he "cannot hold these elephants beyond the middle of this August" and "if the permits are not issued by this time, these elephants will be culled." Declaration of Terence (Ted) E. Reilly ¶ 68. Although plaintiffs challenge Mr. Reilly's representation, as the Court will explain later in its discussion, plaintiffs have little to undercut Mr. Reilly's representation, and, in any event, it must be given credence.

### III. Preliminary Injunction Standard

In order to prevail on their application for a preliminary injunction, plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* It is particularly important for plaintiffs to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Brother-*

*hood of Teamsters, AFL–CIO,* 166 F.3d 356, 366–67 (D.C.Cir.1999).

Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. The Supreme Court has stated that " '[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

### IV. Likelihood of Success on the Merits

It appears from plaintiffs' amended complaint that they are bringing claims that they have not pressed for the purposes of the motion for a preliminary injunction— for example a claim against the federal defendants under Section 7(a)(1) and (a)(2) of the ESA, and the claims against the zoos under the ESA. The Court will limit its discussion of the likelihood of success to the particular claims that have been briefed by the parties—the claim that the permit applications should have been denied because of misrepresentations; the claim that FWS incorrectly found that the importation of the elephants was not detrimental to the species within the meaning of CITES; the claim that FWS erred in concluding that the importation of the elephants was not for a primarily commercial purpose under CITES; and the claim that FWS failed to conduct an appropriate environmental evaluation under NEPA.

Each of these claims is brought under the APA, which requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of

review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

█ The Court notes, moreover, that its review of the merits is confined to the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). The Court will not consider the extra-record declarations and other materials submitted by the parties except to the extent that those materials bear upon the balance of harms.

## A. Standing

Before reaching an analysis of plaintiffs' claims, the Court notes that the zoos—in a brief separate from their opposition to the preliminary injunction motion—have moved to dismiss all of the claims against the federal defendants except for the NEPA claims on the ground that plaintiffs lack standing. Among other things, the zoos argue that the organizational plaintiffs lack standing under ESA and CITES because the only injury they allege is a failure to receive information—information that the zoos claim plaintiffs have no entitlement to under the ESA or CITES. The zoos also argue that the two individual plaintiffs lack standing: one plaintiff, the zoos contend, is neither a citizen nor resident of the United States and thus has no ability to sue in U.S. courts; the second

plaintiff alleges only a psychological injury in connection with the translocation of the elephants to the zoos—an injury that the zoos claim is insufficient to confer Article III standing. The federal defendants asserted at the August 6, 2003, hearing on plaintiffs' motion that they fully support the zoos' position as articulated in the motion to dismiss, and may file their own motion that would additionally argue that plaintiffs do not suffer a danger to a concrete interest sufficient to confer standing for a NEPA claim.

For their part, plaintiffs largely ignore the standing arguments that have been raised, asking instead that the Court defer ruling on this jurisdictional issue at this time. Plaintiffs' substantive response to the standing arguments is confined to part of a footnote and does not directly address some of the concerns raised by the zoos.

Given the fact that plaintiffs have not had sufficient time formally to oppose the zoos' motion to dismiss, the Court will not rule on that motion at this time. The Court notes, however, that defendants have raised substantial unanswered questions about the plaintiffs' standing to pursue some of their claims. The doubts raised about plaintiffs' standing to pursue this action somewhat undermines their likelihood of ultimately succeeding on the merits of their claims.

## B. ESA—Alleged Misrepresentations

█ 50 C.F.R. § 13.21(b)(2), an implementing regulation under the ESA, precludes FWS from issuing a permit where "[t]he applicant has failed to disclose material information required, or has made false statements as to any material fact, in connection with his application." Here, there is no dispute that the initial permit applications of the zoos contained some incorrect, incomplete, or unclear information as to certain facts, such as the identity

of the specific elephants to be imported and the precise location of the elephants in Swaziland. Plaintiffs contend that these flaws constitute material misstatements or omissions that provide a basis for denying the permits.

This claim is not likely to succeed. Whatever merit there may have been to the argument that the initial permit applications were defective, the permits issued as a result of those applications were returned. The agency action before the Court today involves FWS's action on re-submitted permit applications that appear to cure any material defects in the earlier applications. Moreover, contrary to plaintiffs' suggestion, the current applications do not represent applications for "renewal permits" within the meaning of 50 C.F.R. § 13.22; even if they did, the Court is not persuaded that defects in the original applications would require FWS to deny the "renewed," cured applications.

### C. CITES

Plaintiffs next assert violations of CITES. For Appendix I species such as African elephants, CITES requires both an export permit—here from Swaziland officials—and an import permit—here from appropriate U.S. officials. Article 3, paragraph 3 of CITES provides, in relevant part:

An import permit [for an Appendix I species] shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;

. . . . .

(c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily commercial purposes.

CITES, T.I.A.S. No. 8249, Art. III, ¶ 3. FWS is the designated Scientific Authority and Management Authority in the United States. Plaintiffs claim that FWS acted arbitrarily and capriciously in finding that the import was not detrimental to the survival of the species and was not primarily for commercial purposes.

### 1. Not Detrimental

■ On June 26, 2003, FWS issued a five-page finding with respect to each zoo that the proposed import is likely to be for purposes that are not detrimental to the survival of the species. AR 83, 84.[1] FWS reviewed Swaziland's concerns about its expanding elephant population, noting, among other things, Swaziland's concerns about conflicts and competition between elephants and black rhinos, and the elephants' destruction of nesting sites for birds. AR 83 at 1–3; AR 84 at 1–3. FWS noted that Swaziland lacks the resources to expand the elephant habitat and cannot translocate the elephants within the country. AR 83 at 2; AR 84 at 4. As FWS noted, Swaziland has decided to remove eleven elephants from its population. *Id.* Further, FWS stated, Mr. Reilly has noted that if the elephants cannot be exported or translocated, they will be culled. *Id.* Indeed, FWS found that "the specimens in this application are intended by Swaziland to be removed from the wild population as part of a wildlife management program whether they are exported or not." AR 83 at 3; AR 84 at 3.

FWS noted that the import of the specimens is consistent with the American Zoo and Aquarium Association ("AZA") African

---

1. The pages in the administrative record are sequentially numbered. Citations to the ad-ministrative record will thus be presented in the format "AR [document number]."

Elephant Species Survival recommendations. AR 83 at 3; AR 84 at 3. FWS also noted that the specimens will be placed in a breeding situation, consistent with AZA efforts to improve reproduction of the species in North America. AR 83 at 3–4; 84 at 3–4. Moreover, FWS noted, Mr. Reilly intends to use the revenue generated by the sale of the specimens for park operation, expansion of protected habitat, fencing, and equipment such as anti-poaching gear. AR 83 at 4; AR 84 at 4. Based on the foregoing findings, FWS concluded that the importation would "be for purposes that are not detrimental to the survival of the species." AR 83 at 4; AR 84 at 4.

Plaintiffs challenge this conclusion, arguing that the importation of the elephants will result in the removal of one-third of the total elephant population in Swaziland and, by FWS's own admission, will reduce genetic diversity. Moreover, plaintiffs assert that FWS has disregarded the detriment to the remaining elephants and their social structure. In addition, plaintiffs argue that, with respect to the non-detriment finding, as well as the other findings made under CITES and NEPA, FWS abdicated its statutory obligations by "simply accept[ing] all of the representations made by either Reilly or the Zoos—the very parties to the transaction who stand to benefit financially from the sale of the elephants." Pls.' Mem. Supp. Mot. Prelim. Inj. at 35.

Plaintiffs' central arguments—which focus on the effect of removing the elephants from their herd—miss the point. As FWS found, Swaziland has already determined that it will remove the elephants. Thus the effect on the elephants remaining in the herd—including the effect on their genetic diversity or social structure—is beyond the ability of FWS to control. All FWS may do is determine whether the

elephants may be imported, given the fact that Swaziland has decided to remove them. It is this importation decision by FWS—not the removal and export decision by Swaziland—that is the proper focus of the non-detrimental analysis. This conceptualization is consistent with the two-part analysis under CITES, wherein the state of **import** must determine that the "**import** will be for purposes which are not detrimental to the survival of the species involved," and the state of **export** must determine that the "**export** will not be detrimental to the survival of that species." CITES, T.I.A.S. No. 8249, Art. III, ¶ 2(a), 3(a) (emphases added).

That being said, FWS nevertheless did consider to some extent the effects of the export on the remaining elephants—specifically noting that the number of remaining elephants will be "optimal for ensuring regeneration of the vegetation required by the elephants," that the "removal of the specimens would not affect the breeding capacity of the remaining elephants," and that the removal of the elephants "would create space for a gradual increase in the population." AR 83 at 3; AR 84 at 3. Although it is true that these findings relied heavily upon Mr. Reilly, FWS also relied upon a Senior Scientist at Kruger National Park as well as published recommendations practiced by that park. *See id.*

Plaintiffs argue that FWS should have considered alternatives to the export of the elephants, such as translocation to other refuges in Africa. However, not only does CITES not require a consideration of alternatives to translocation, but here the alternative translocations that plaintiffs suggest were not within the control of FWS or the zoos, which do not control the elephants. Moreover, even the alternatives pressed by plaintiffs involve removal and thus its effect on the remaining herd.

Overall, given that the elephants are to be used for breeding in the United States and, moreover, that proceeds from the importation are going to be used by Swaziland for the benefit of the elephant habitat there, it was not arbitrary and capricious for FWS to determine that the importation would not be for purposes that are detrimental to the survival of the species. It is perhaps worth emphasizing in this regard that CITES expressly requires the state of import to determine, and FWS did ultimately determine, that the "import will be for purposes which are not detrimental to the survival of the species involved." CITES, T.I.A.S. No. 8249, Art. III, ¶ 3(a). The zoos' purpose of propagating the species through captive breeding is not inconsistent with the continued survival of African elephants.

### 2. Commercial Purpose

■ On June 11, 2003, FWS issued two one-page findings that the import of the elephants was not primarily for commercial purposes. AR 64, 65. With respect to each zoo's application, FWS noted that the "primary purpose of the import is to improve the breeding capability of captive elephants within the United States and to provide conservation education to visitors." *Id.* FWS further noted that "[a]lthough the zoo may collect additional gate receipts, gift shop sales, and donations due to the import of these elephants, the money is going back into the zoo, the elephant breeding program, and/or in-situ conservation programs in which the zoo participates." *Id.* FWS concluded that given that the zoos are "non profit institution[s] and that any profits made from obtaining the elephants from Swaziland will be used for in-situ and ex-situ conservation work carried out at the zoo[s], . . . the import of these specimens is not for primarily commercial purposes." *Id.*

Plaintiffs challenge this conclusion, arguing that because the elephants will be exhibited for paying guests, and indeed, because elephants are a species that tends to increase gate admissions at zoos, the importation of the elephants must be for a primarily commercial purpose. Moreover, to the extent that the zoos seek to use the elephants for captive breeding purposes, plaintiffs argue, any newborn elephants likewise will be displayed to the financial benefit of the zoos, if not in fact sold to other zoos, also to be displayed for admission fees. Finally, plaintiffs contend that FWS should not have relied upon "conversation education" as a purpose because the zoos did not rely on this purpose in their applications.

CITES itself does not define the terms "commercial purpose" or "primarily commercial purpose." Moreover, the Court finds that the term "primarily commercial purpose" is ambiguous—it is not clear what a commercial purpose might be or how to determine if purposes are "primarily" commercial.

The Conference on CITES has passed a resolution concerning the definition of "primarily commercial purposes" that both plaintiff and defendant look to for guidance. Indeed, FWS expressly relies upon the resolution in its finding. The resolution, "Resolution Conf. 5.10," at the outset notes the difficulty in arriving at a uniformly accepted meaning of "commercial purpose" and clarifies that the commercial purposes examination concerns only "the intended use of the specimen . . . in the country of importation, not the nature of the transaction between the owner of the specimen in the country of export and the recipient in the country of import." Thus, as an initial matter, the fact that Swaziland may have profited from the sale of the elephants—and likewise the fact that Swaziland intends to reinvest the funds for

the benefit of remaining elephants—is irrelevant.

Resolution Conf. 5.10 further states that "[a]n activity can generally be described as 'commercial' if its purpose is to obtain economic benefit, including profit (whether in cash or in kind) and is directed towards the resale, exchange, provision of a service or other form of economic use or benefit." The country of import is to define "commercial purposes" as "broadly as possible so that any transaction which is not wholly 'non-commercial' will be regarded as 'commercial.'" Importantly, the Resolution states: "In transposing this principle to the term 'primarily commercial purposes,' it is agreed that all uses whose non-commercial aspects do not clearly predominate shall be considered to be primarily commercial in nature."

Resolution Conf. 5.10 provides several non-exhaustive examples as guidance for the commercial purpose determination. Unfortunately, none of the examples fits exactly the current situation. Of most apparent relevance, example (e) concerns imports with relation to "captive breeding programmes." However, the example focuses on "captive breeding programmes [that] sell surplus specimens to underwrite the cost of the captive breeding programme." Indeed, the example cross-references a separate resolution, Conf. 2.12 (since amended as Conf. 10.16), that involves trading specimens bred in captivity. *See* Resolution Conf. 10.16 (Rev.). Neither the zoos here nor Mr. Reilly's parks in Swaziland fit this mold. Furthermore, there is some suggestion in the Resolution that the kind of captive breeding programs contemplated in example (e) "must be aimed as a priority at the long term protection of the affected species" and that importations for captive-breeding "must be part of general programmes aimed at the recovery of a species." Here, although

ultimately successful breeding by the zoos may eliminate or decrease future need for importation, it is not entirely clear that "long term protection" and "recovery" of African elephants is a "priority" or "aim" of the importation. Thus, example (e) is not particularly instructive.

In its finding, FWS quoted language from example (e) stating that "importations for ... [captive breeding] could be allowed if any profit made would not inure to the personal economic benefit of a private individual or shareholder. Rather, any profit gained would be used to support the continuation of the captive breeding programme to the benefit of the Appendix I species." To the extent that, in quoting this language, FWS intended to convey that it believed that the zoos fit within the "captive breeding programmes" contemplated in example (e), the Court concludes that FWS erred. The Court finds the language in example (e) to be confusing, but it certainly does not provide **direct** support for importing animals from the wild for use in the type of captive breeding program at issue here.

It may be, however, that by quoting language in example (e), FWS was merely trying to abstract from the example a more general observation that where profit is derived from an imported animal but the income is funneled back into a program that benefits the Appendix I species, rather than being allocated to the economic benefit of a private individual or shareholder, there is not necessarily a commercial purpose. That principle arguably can be extracted from example (e). Here, as FWS emphasizes, the money earned from gate receipts will "go[ ] back into the zoo, the elephant breeding program, and/or in-site conservation programs in which the zoo participates." AR 64, 65. Hence, applying the principle reasonably drawn from example (e) to the facts here does

support FWS's conclusion that the elephants will not be used for primarily commercial purposes.

In example (c), Resolution Conf. 5.10 provides that specimens may "be imported by government agencies or non-profit institutions . . . for purposes of conversation, education, or training." As noted above, in its finding, FWS relied in part on the educational aspect of the zoos' desire for importation. However, plaintiffs are correct that in the initial applications, the zoos did not emphasize education as the principal purpose of the importation. Rather, the zoos stated that their purpose was for captive reproduction and to assist the Swaziland government with their population and habitat issues. See AR 1 ¶ 6.a. (Lowry Park Zoo application—"The purpose for this import is twofold: 1) for captive reproduction and propagation and 2) to assist the Swaziland government with their population control program."); AR 2 ¶ 6.a. (San Diego Zoo application—"The purpose for this Import is for captive reproduction and propagation of this species."). Moreover, in a public comment, the zoos actually urged FWS to distinguish between the primary purposes noted in the applications and other "secondary activities and benefits." AR 75 at 5.

Nevertheless, it is true that certain aspects of the zoos' initial applications make clear that education is a component of the zoos' mission that would be furthered by the importation of the elephants. For example, the Lowry Park application notes that "[e]ducational signage regarding elephants' ecological role and the conservation needs of the species will figure prominently at the perimeter of the exhibit." AR 1 ¶ 6.d. Moreover, the zoos append to their applications the African Elephants Species Survival Plan and the AZA Policies on Elephants, both of which note the role of zoos in providing conservation edu-

cation. See AR 1 at Addendum C (African Elephant Species Survival Plan: "Elephants, as a flagship species, provide unique opportunities for zoos' conservation education efforts."); AR 1 at Addendum F (AZA Policies on Elephants: "AZA zoos that currently exhibit or desire to exhibit elephants should make every effort to maintain elephants in their collections so that they can contribute to conservation through public, education, scientific research, and the support of field conservation."); AR 2 (appending the same documents).

Overall, the Court is not at this time persuaded that plaintiffs are likely to succeed on their claim that FWS acted arbitrarily, capriciously, or otherwise not in accordance with law in concluding that the importation was not for primarily commercial purposes. Although the zoos ultimately may realize additional admission revenue as a result of importing the elephants, and although the importation here does not fit cleanly into any of the non-exhaustive list of examples in Resolution Conf. 5.10, the zoos' status as non-profit institutions, their plans to use the elephants for breeding purposes and not merely for display, and their role in educating the public about conservation together provide a reasonable basis for FWS's conclusion that the importation is not for primarily commercial purposes. Under the guidance of Res. Conf. 5.10, it is reasonable for FWS to conclude that this is not a setting in which commercial aspects of the zoos' purposes predominate over non-commercial aspects. Plaintiffs' interpretation of the commercial purposes test, on the other hand, would essentially preclude all importation of Appendix I species by zoos that would display the animals and charge a fee for general admission—almost always the context where zoos are involved. Neither the language of CITES nor the Resolution indicates that the Treaty goes that far.

Moreover, although the parties did not brief this issue prior to the hearing, both FWS and plaintiffs now agree that FWS's interpretation of the language of CITES is subject to deference under *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Iceland S.S. Co. v. U.S. Dep't of Army,* 201 F.3d 451, 458 (D.C.Cir.2000) ("To the extent that the meaning of treaty terms are not plain, we give 'great weight' to 'the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement.' " (citation omitted)); *More v. Intelcom Support Services, Inc.,* 960 F.2d 466, 472 (5th Cir. 1992) (*Chevron* deference applies to treaties). Accordingly, the Court does not find that plaintiffs are substantially likely to succeed on their claim that FWS's interpretation of CITES and findings on commercial purpose were arbitrary or capricious.

**D. NEPA**

Under NEPA, an agency must prepare an Environmental Impact Statement ("EIS") for any proposed "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Under the CEQ regulations interpreting NEPA, a "major Federal action" is defined to "include[ ] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

Here, FWS initially determined that its approval of the permits was categorically excluded from NEPA requirements. *See* AR 19, 20. Nevertheless, with respect to each zoo's permit application, FWS prepared a draft Environmental Assessment ("EA")—a "concise public document" that, among other things, provides "evidence and analysis for determining whether to prepare an environmental impact state-

ment or a finding of no significant impact." 40 C.F.R. § 1508.9(a). After a twenty day public comment period, the FWS issued a final EA, as well as a Finding of No Significant Impact ("FONSI"). AR 92, 93.

The final EA, which is seventeen pages in length, reviews the purpose of the translocation, both from Swaziland's perspective and from the zoos' perspective, considers the impact on the environment both in Swaziland and the United States, and considers the environmental consequences of granting the permits, as opposed to denying them or granting them only for a smaller number of elephants. AR 92. The EA's general conclusions are that importing the elephants will ameliorate the environmental problems caused by over-population of the elephants in the Swaziland reserves, that the elephants will not be adversely affected by translocation, and that the public will not be adversely affected by importation. *Id.*

Plaintiffs now challenge FWS's environmental analysis on several bases. Principally, plaintiffs claim that the environmental effects of granting the permits will be sufficiently significant that an EIS—and not merely an EA—should have been prepared. Plaintiffs also allege that the analysis contained in the EA is incorrect or inadequate, and, in particular, that the EA fails to explore the full range of alternatives to issuing the permits.

A critical issue raised by plaintiffs' complaint is whether, under NEPA, FWS is required to analyze the importation's environmental effects outside the United States and, specifically, the effects within Swaziland. If FWS is required only to consider environmental impacts within the United States, then plaintiffs' allegations concerning defects in FWS's environmental analysis with respect to the effects extraterritorially – allegations that dominate plaintiffs' claims and rely on substan-

tial expert scientific assessment—are legally irrelevant.

FWS raises two arguments that it was required only to analyze domestic effects: (1) that the "federal action" that requires environmental evaluation in this case is limited to FWS's decision to allow importation of the elephants, not Swaziland's decision to export the elephants; and (2) that NEPA's EIS requirement does not apply to possible environmental impacts within foreign sovereign nations. The Court will consider each of these theories in turn.

### 1. Subject to Federal Control

 Case law makes clear what the governing CEQ regulation states on its face—that only actions "which are potentially subject to Federal control and responsibility" must be the subject of an environmental evaluation. 40 C.F.R. § 1508.18. *See Macht v. Skinner*, 916 F.2d 13, 18 (D.C.Cir.1990); *Citizens Alert Regarding the Environ. v. U.S. EPA*, 259 F.Supp.2d 9, 14–15 (D.D.C.2003); *Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 271 (8th Cir.1980). That being said, "federal involvement in a non-federal project may be sufficient to federalize the project for purposes of NEPA." *Macht*, 916 F.2d at 18. Thus courts may have to consider whether the degree and nature of federal involvement in a state, local, private, or, in this case, transnational project implicates obligations under NEPA. "In cases, such as this one, where there is no claim that the non-federal project is being federally funded, the circuits have … focus[ed] … on the indicia of control over the private actors by the federal agency." *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 302 (1st Cir.1998) ("[W]e look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority

over the outcome."); *see also Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512–14 (4th Cir.1992) ("[A] non-federal project is considered a federal action if it cannot begin or continue without prior approval by a federal agency and the agency possesses authority to exercise discretion over the outcome." (internal quotation marks and citation omitted)); *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir.1998) ("major federal action" is present when "the federal government has actual power to control the project").

Here, the aspect of the environmental analysis that is the focus of plaintiffs' concerns relates to the effects of removal of the elephants from their habitat in Swaziland. That removal, however, is not subject to federal control. As the administrative record makes clear, Swaziland has determined that its elephant population must be reduced, and it will do so either by exporting these elephants to the United States or by culling them. FWS's conclusion that the elephants will be removed from the reserves in Swaziland is fully supported by the record and thus reasonable. *See, e.g.*, AR 2 (Sept. 1., 2001, Memo from Mr. Reilly); AR 49; AR 75 (June 18, 2003, notice by Mr. Reilly). FWS executes no discretion with respect to Swaziland's determination. FWS's role—and the scope of its authority—is therefore limited to determining whether, given Swaziland's conclusion that it will either export or cull the elephants, issuance of import permits is appropriate. This limited role is insufficient "'to turn essentially private action'"—by a foreign sovereign no less— "'into federal action.'" *Winnebago Tribe of Neb.*, 621 F.2d at 272 (citation omitted).

 Plaintiffs might argue that FWS's issuance of the permits makes possible the exportation of the elephants and therefore FWS must also consider the environmental effects of exportation. But

"the fact that a federal action is a 'but for' cause of a non-federal action does not, in itself, subject the non-federal action to NEPA." *See Landmark West! v. USPS*, 840 F.Supp. 994, 1006 (S.D.N.Y.1993). Where a government agency lacks "sufficient control and responsibility" over the entire project, it is not required to undertake a project-wide environmental review. *See Winnebago Tribe*, 621 F.2d at 272–73; *see also Goos v. ICC*, 911 F.2d 1283, 1294 (8th Cir.1990) ("[W]hether an agency action or project is part of some other concededly major federal action depends largely on whether the agency exercises legal control over the allegedly non-federal action or project."); *Save the Bay, Inc. v. U.S. Corps of Engineers*, 610 F.2d 322, 327 (5th Cir.1980). Here, Swaziland has determined that it will remove the elephants from their habitat one way or another; FWS lacks any control whatsoever over this decision and the resulting environmental effects in Swaziland. FWS therefore has no obligation to conduct an EIS with respect to the effects in Swaziland of removal of the elephants. *See Citizens Against Rails–to–Trails v. Surface Trans. Bd.*, 267 F.3d 1144, 1151 (D.C.Cir.2001) ("If … the agency does not have sufficient discretion to affect the outcome of its actions, … the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable.").

### 2. Extraterritorial Application

■ The law concerning extraterritorial application of NEPA is unsettled. As a general rule, there is a "presumption that Acts of Congress do not ordinarily apply outside our borders." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). NEPA, by its terms, does not state whether it has extraterritorial effects, and

"NEPA's legislative history illuminates nothing in regard to extraterritorial application." *Natural Res. Defense Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1367 (D.C.Cir.1981). Nevertheless, in *Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 533 (D.C.Cir.1993), the D.C. Circuit ruled that "since NEPA is designed to regulate conduct occurring within the territory of the United States"—i.e., decisionmaking processes of federal agencies—"and imposes no substantive requirements which could be interpreted to govern conduct abroad"—and hence poses no choice of law dilemmas "the presumption against extraterritoriality does not apply to this case." The court's ruling, however, was bolstered by (or even dependent on) the fact that the case involved Antarctica, which is not a foreign country and is in some measure subject to U.S. legislative control. *Id.* at 533–534. Indeed, ultimately, the court specifically noted that it "[did] not decide … how NEPA might apply to actions in a case involving an actual foreign sovereign." *Id.* at 537.

Other decisions in this Circuit have found that the presumption against extraterritoriality does preclude application of NEPA to environmental effects outside the United States. In *NRDC v. NRC*, Judge Wilkey, writing on behalf of himself only, ruled that NEPA did not require the NRC to evaluate the impacts in the Phillippines of nuclear exports to that country. 647 F.2d at 1365–66. In *NEPA Coalition of Japan v. Aspin*, 837 F.Supp. 466, 467 (D.D.C.1993), Judge Pratt of this Court ruled that NEPA did not require agency consideration of environmental impacts for U.S. military installations in Japan. Judge Pratt distinguished *Massey* on the ground that its reach was expressly limited to situations where no foreign sovereign was

involved.[2]

It is true, as plaintiffs point out, that the reluctance of the judges in *NRDC* and *NEPA Coalition* to apply NEPA extraterritorially was motivated in part by concerns about interference with the foreign relations of the United States, given the sensitive nature of the federal actions at issue—a concern which is not as prominent here. *See NRDC*, 647 F.2d at 1358 (discussing risk of impeding on conduct of U.S. foreign relations); *NEPA Coalition*, 837 F.Supp. at 467 (discussing concern with intruding upon a long-standing treaty relationship). Nevertheless, this Court agrees with these cases that appropriate weight should be given to the presumption against extraterritoriality.[3] In the present case, the Court is not dealing with environmental effects in a no-man's land such as Antarctica, where the United States has some real measure of control; rather, it is dealing with environmental affects in a foreign sovereign nation. That nation has made an independent determination to proceed with the export of the elephants under CITES, has concluded that the export will not be detrimental to the species, and has determined that if the export is not possible, it will be necessary to cull the elephants. Absent some further indication from Congress, this Court is not inclined to take the step of requiring FWS to conduct an environmental analysis aimed at second-guessing the validity of Swaziland's determinations. This view is bolstered by the fact that an environmental assessment of effects in Swaziland would be to no avail in any event because, as discussed above, FWS is not a position to control whether the elephants should be removed from the herds. Ultimately, in the present procedural context, this assessment markedly undercuts the likelihood that plaintiffs will succeed on the merits of their NEPA claims.

### 3. Alleged Deficiencies in FWS's Environmental Analysis

Having preliminarily determined that FWS was not required to assess the environmental effects in Swaziland or other factors beyond FWS's control, the Court must proceed to consider plaintiffs complaints concerning the environmental analysis that FWS was required to perform. Plaintiffs broadly allege two types of deficiencies: (1) that FWS should have produced an EIS, not an EA followed by a FONSI; and (2) that the EA inadequately assessed alternatives to granting the import permits.

### a. Necessity for EIS

█ In determining whether an action "significantly affects" the environment, and thus whether an agency must produce an EIS, the agency must consider "both context and intensity." 40 C.F.R.

---

2. Other courts, consistent with *Massey*, have ruled that NEPA requires an EIS for environmental impacts on the high seas—like Antarctica a context not involving a foreign sovereign. *Center for Biological Diversity v. Nat'l Science Found.*, 2002 WL 31548073, at *2 (N.D.Cal. Oct. 30, 2002); *Natural Res. Defense Council, Inc. v. U.S. Dep't of Navy*, 2002 WL 32095131, at *8–12 (C.D.Cal. Sept. 17, 2002).

3. As Judge Pratt pointed out, *Massey's* suggestion that the presumption against extraterritoriality does not apply to NEPA because it is merely procedural was undermined some-

what by later Supreme Court rulings that the presumption against extraterritoriality is not grounded exclusively in concerns about potential conflict of laws problems. *See NEPA Coalition*, 837 F.Supp. at 467 n. 3 (citing *Smith v. United States*, 507 U.S. 197, 204 n. 5, 113 S.Ct. 1178, 122 L.Ed.2d 548(1993) and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173–74, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993)). These cases recognize as a significant factor the proposition that Congress legislates domestically, not internationally.

§ 1508.27. With respect to "context," the CEQ regulations provide:

The significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.

*Id.* § 1508.27(a). Plaintiffs' challenge here does not focus on the "context" inquiry.

"Intensity" refers to the "severity of impact," and requires a consideration of several factors:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

 " 'Because the NEPA process involves an almost endless series of judgment calls . . . the line-drawing decisions . . . are vested in the agencies, not the courts.' " *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 42 (D.D.C.2003) (quoting *Coalition on Sensible Trans., Inc. v. Dole,* 826 F.2d 60, 66 (D.C.Cir.1987)). A court's role " 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " *City of Olmsted Falls v. FAA,* 292 F.3d 261, 269 (D.C.Cir.2002) (quoting *Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). In the context of determining whether FWS's decision to issue a FONSI and not prepare an EIS was arbitrary and capricious, the court should consider:

(1) whether the agency took a "hard look" at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Sierra Club v. Peterson,* 717 F.2d 1409, 1413 (D.C.Cir.1983).

Here, plaintiffs argue that four "intensity" factors augur in favor of performing an EIS – "adverse[ ][e]ffect [on] an endangered or threatened species," effect on "public health or safety," environmental effects that are "highly controversial," and establishment of a "precedent for future actions with significant effects." 40 C.F.R. § 1508.27(b)(2), (4), (6), (9). Plaintiffs emphasize the last two of these here.

With respect to the adverse effect on the species, as an initial matter, the only "species" at issue here are the eleven elephants that will be imported. There will be no broad impact on African elephants in general sufficient to warrant an EIS. Furthermore, the only public health issue potentially raised by the import of the elephants is the danger of Foot and Mouth Disease ("FMD"). However, FWS explains in the EA that it consulted with U.S. Department of Agriculture – the agency responsible for animal health and disease issues – which not only recommended granting the permits, but also specifically indicated that it had no concern about FMD coming from Swaziland. AR 92 at 7–8. FWS also noted that elephants are not susceptible to FMD and that Swaziland has certified itself to be FMD-free. *Id.* Thus FWS convincingly established that there was no significant public health issue associated with importation of the elephants.

With respect to the assertion that the FWS decisions on the permits represent "a precedent for future actions with significant effects or represents a decision in principle about a future consideration," plaintiffs' argument misses the point. FWS's issuance of the permits does not "establish a precedent that would form 'a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues.'" *Williams,* 246 F.Supp.2d at 47 (quoting *Sierra Club v. Marsh,* 769 F.2d 868, 879 (1st Cir.1985)). Nor has FWS made a decision in principle about a "future consideration." Rather, because applications for permits are considered on an individual basis, and FWS will be able to make a meaningful assessment with respect to future applications regardless of what action it has taken on the zoos' applications here, this factor does not support issuance of an EA. *See Sierra Club,* 769 F.2d at 879.

Plaintiffs' final (and most persuasive) argument is that the effects of the import on the eleven elephants are "highly controversial." *See* 40 C.F.R. § 1508.27(4). In this regard, plaintiffs point to the public comments submitted by elephant experts arguing that the eleven elephants will be severely adversely impacted by their transportation to and confinement in the zoos. *See, e.g.,* AR 69–71. These experts' contentions, although not directly mentioned in the EA, were rejected by FWS, which took the position that the translocation of the elephants will have no significant effects. In reaching this conclusion, the FWS made several findings: that elephants have been successfully moved by air and that veterinarians and elephant handlers have developed procedures to safely move elephants long distances; that the planned transportation of the elephants comported fully with International Transport Association Standards and 40 C.F.R. § 14, which concerns humane

transport; that the planned treatment and breeding of the elephants in the zoos meets the standards for Elephant Management and Care devised by the American Zoological Society; that the zoos had demonstrated that their personnel were qualified to care for the elephants and provide all necessary medical and husbandry care required; and that the elephants would be maintained in suitably large enclosures. AR 92 at 11–13.

The EA reflects that FWS took a "hard look" at concerns with the transportation, acclimation and housing of the elephants. Moreover, in reaching its reasonable conclusion that there was no significant environmental effect, the FWS did not simply speculate – or rely only on the zoos' representations – but rather made distinct findings based in part on applicable regulations and industry standards.

Nevertheless, the Court cannot help but note the disparity between FWS's conclusion that the transportation and housing proposed by the zoos would be adequate and the opinions of several experts that translocation would severely impact the elephants. Thus the Court finds that there is at least some degree of controversy with relation to the effects of the translocation on these elephants.

Plaintiffs, however, have not presented persuasive authority that the presence of one out of ten intensity factors – here, the presence of at least some level of controversy – is sufficient to require an EIS. Neither of the two cases that plaintiffs rely upon fully supports this proposition. *National Audubon Society v. Hoffman*, 132 F.3d 7, 18 (2d Cir.1997), nowhere states that the presence of one CEQ factor is sufficient to require preparation of an EIS. And although *Public Service Co. of Colo. v. Andrus*, 825 F.Supp. 1483, 1495 (D.Idaho 1993), states that the "presence of one or more [CEQ] factors should result in an

agency decision to prepare an EIS," the Ninth Circuit case that *Andrus* relied upon, *LaFlamme v. FERC*, 852 F.2d 389, 398 (9th Cir.1988), does not speak at all to the issue whether one CEQ factor is sufficient to require an EIS.

Here, given that only one CEQ factor is present, and that the relevant action involves the effects in the United States of importing just eleven elephants into two zoos, the Court cannot conclude at this stage that plaintiffs are substantially likely to succeed on their claim that FWS acted arbitrarily and capriciously by issuing an environmental assessment instead of an EIS and finding that there would be no significant impact from the importation.

**b. Failure to Consider Alternatives**

■ Plaintiffs' principal substantive complaint about the EA is that it fails to consider alternatives. Most of these alternatives involve relocation of the elephants to reserves elsewhere in southern Africa. Such alternatives, however, were beyond the power of FWS or even the zoos to affect because the elephants are in the control of Swaziland. Moreover, FWS actually made an inquiry to Reilly about some of these alternatives, *see* AR 48, by the time the EA was published, Mr. Reilly had made abundantly clear that the only alternative he would consider would be culling the elephants – not translocating them elsewhere in Africa, *see, e.g.,* AR 75 (June 18, 2003, notice by Mr. Reilly) ("If these particular 11 animals do not find homes at San Diego Wild Animal Park and Lowry Park Zoo before August 2003, ... we will sadly be forced to cull them as stated numerous times previously."). He specifically considered and rejected many of the proposed alternatives. AR 48; *see also* AR 49. Given that the range of alternatives that an agency must explore in an EA is governed by a "rule of reason,"

*Davis v. Latschar,* 202 F.3d 359, 368 (D.C.Cir.2000), and must be "moored 'to some notion of feasibility,'" *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991) (citation omitted), plaintiffs are not substantially likely to prevail on a claim that FWS should have considered alternatives involving translocation within Africa. *See also Sierra Club v. Watkins,* 808 F.Supp. 852, 871 (D.D.C.1991) ("[A]n agency need not 'consider alternatives when such consideration would serve no purpose' or when they are speculative.") (quoting *Natural Res. Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1054 (D.C.Cir.1979)).

██ Plaintiffs additionally argue that FWS should have further considered requiring, as a precondition to import, that the zoos exhaust every possible source of captive elephants, both domestically and abroad, before seeking import. However, "[t]he fact that the EA may not have considered a specific alternative preferred by plaintiffs is simply not grounds for finding that the agency failed to meet its obligations in preparing the EA, or that the agency's decision was 'arbitrary and capricious.'" *City of Roseville v. Norton,* 219 F.Supp.2d 130, 170 (D.D.C.2002). The breeding program the zoos desire to revive, moreover, is somewhat dependent on introducing elephants from the wild. The Court is satisfied that FWS considered a reasonable range of alternatives given the limited scope of its authority in this permitting context.

#### c. Other NEPA Allegations

As a final matter, the Court notes that plaintiffs assert a generalized complaint that FWS did not conduct an independent evaluation of environmental consequences, but rather relied upon Reilly and the zoos for its information. Much of plaintiffs' argument in this regard relates to environ-

mental effects or available alternatives in Africa, and thus would not be relevant given the Court's earlier assessment of the "federal control" and extraterritorial issues. With respect to the NEPA obligations that FWS was plainly required to undertake, the Court notes that, at the present time, it is not persuaded that FWS's analysis, which included reliance on a consultation with another agency, relevant literature, and industry standards, was not sufficiently independent to meet its obligations. *See, e.g.,* AR 92 at 9–11. FWS does not appear to have "delegate[d] to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it." *Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246, 1258 (D.C.Cir.1988). Rather, the 17–page EA, together with the history of the permit process here, documents a careful assessment by FWS.

### V. Balance of the Harms

██ Having concluded that plaintiffs do not have a substantial likelihood of success on any of their claims, the Court will proceed to consider the balance of harms. A principal consideration in the harms assessment in this case is what would happen to the elephants if a preliminary injunction were granted.

As noted earlier, the elephants are currently located in a boma separated from other elephants. According to Mr. Reilly, this creates "pathogenic threats to [the elephants'] health," and places "unnecessary strain on tractor haulage and human resources, maintenance of water installations (during the persisting drought), and other park infrastructure." Reilly Aff. ¶ 66. Moreover, armed security personnel must guard the boma 24 hours a day – diverting the guards from their task of

protecting rhino and other elephants from poachers. *Id.* at ¶ 67.

According to Mr. Reilly, "[t]his situation cannot persist indefinitely and has to be brought to a conclusion forthwith as it is compromising . . . day to day conservation efforts." *Id.* (emphasis omitted). "Each day that passes increases . . . expenses – to the extreme detriment of the entire Swaziland wildlife conservation effort." *Id.* at ¶ 73. Therefore, Mr. Reilly states, he "cannot hold these elephants beyond the middle of this August." *Id.* at ¶ 68. Moreover, he explains that he "cannot and will not release these elephants back into the herds" because of the need to reduce the herd and the additional degradation to the habitat that would occur. *Id.* Ultimately, Mr. Reilly states, "if the permits are not issued by [the middle of this August], these elephants will be culled." *Id.* "As much as we want to avoid it, if the elephants are not ready for export, with all necessary U.S. permits by [mid-August], they will, unfortunately, be killed." *Id.* at ¶ 69.

Plaintiffs ask the Court to reject Mr. Reilly's representations that he will kill the elephants. They point to Mr. Reilly's statements in the record that he will do everything possible to avoid culling the elephants, and they note that they have identified certain reserves in Africa that state that they would accept the elephants. Plaintiffs also note Mr. Reilly's long history with these elephants and his affinity for wildlife. Ultimately, however, they essentially ask the Court to take a leap of faith that, despite Mr. Reilly's statements in his affidavit that he will cull the elephants, in fact he will not do so.[4]

The Court cannot take such a leap. Granted, the Court does not appreciate

brinksmanship. But the statements in Mr. Reilly's affidavit are unequivocal. Moreover they are generally consistent with his other statements about his intentions throughout the administrative record, *see, e.g.,* AR 2 (Sept. 1., 2001, Memo from Mr. Reilly); AR 49; AR 75 (June 18, 2003, notice by Mr. Reilly), and thus seem to reflect well-considered views developed independent of this litigation. Although plaintiffs claim to have found suitable homes for the elephants, Mr. Reilly makes clear in his affidavit that he does not intend to pursue any alternatives other than immediate culling. Moreover, the Court notes in this regard, although culling may seem offensive, it has been previously employed to reduce animal populations in southern Africa. AR 40.

At the hearing in this matter, plaintiffs argued that the zoos may already have some control over the elephants and thus can prevent culling, at least until a final decision on the merits. The zoos, however, deny such control, and the import contracts produced to the Court by the zoos upon request of the plaintiffs do not indicate that the zoos would have the ability legally or factually at this time to prevent Mr. Reilly from culling the elephants. In sum, therefore, the Court must accept that if the elephants are not imported in the immediate future they will be culled.

In contrast to the relative certainty of the outcome in the event plaintiffs' motion for a preliminary injunction were granted, it is worth noting that it remains unclear what the disposition of the elephants would be in the event that the Court denied the motion but ultimately ruled in favor of plaintiffs on the merits after the elephants have been imported. Counsel for FWS

---

4. In the end, as stated unequivocally by counsel for plaintiffs at the conclusion of the August 6 hearing, given the choice plaintiffs would rather see the elephants dead than in a zoo.

explained at the hearing that in such circumstances, FWS could attempt to export the elephants back to Swaziland but FWS could not control whether or not Swaziland would accept the elephants. In light of Mr. Reilly's statements about the need to remove the elephants in the first place, the Court finds it implausible to believe Swaziland would take the elephants back. Moreover, although the issue was not briefed by the parties, a potential complication in seeking alternative destinations might be that CITES would make it difficult to export the elephants to any other country if this Court found that the initial importation into the U.S. had been invalid.

With this background, the Court will consider the relevant harms to plaintiffs, the federal defendants, the zoos, and the public.

### A. Plaintiffs

Plaintiffs ask the Court to maintain the status quo because their interests will be irreparably harmed if the elephants are imported and placed at zoos. Plaintiffs are correct that their interests—or at least the purported interests of the individual plaintiffs in appreciating the elephants and feeling concern for their welfare, rather than the informational interests of the organizational plaintiffs—will in fact be harmed if the animals are placed in the zoos. Moreover, as discussed above, in the event the Court denies a preliminary injunction and the elephants are imported, it may be that the elephants could not later be placed in an environment consistent with plaintiffs' interests even if the Court were ultimately to rule in favor of plaintiffs on the merits.

On the other hand, if an injunction is granted the elephants will be culled. This might appear to mean, somewhat ironically, that plaintiffs would be irreparably injured as the result of the very injunction that they request; however, at the August 6 hearing in this matter, counsel for plaintiffs explained that, from plaintiffs' perspective, the elephants will be better off – and thus plaintiffs' interests will be more fully advanced—if the elephants are killed rather than imported and placed in the zoos. Taking the plaintiffs at their word, the Court concludes, on balance, that plaintiffs' interests—interests about which the Court has some concerns in terms of standing – will be harmed if an injunction is not granted, yet somewhat advanced if an injunction is granted.

### B. Federal Defendants

With regard to the federal defendants, the Court does not see why those entities have more than an abstract interest in the disposition of the elephants. Although the Department of the Interior and FWS undoubtedly have an institutional interest in seeing their policy vindicated, they are detached government bodies that do not, as a practical matter, stand to gain or lose based on what happens to the elephants as a result of the Court's preliminary injunction decision.

### C. Zoos

The zoos undoubtedly have an interest in importing the elephants for use in their breeding programs. Culling of the elephants in the event an injunction is issued will thus substantially harm the zoos. On the other hand, it may be that the zoos could successfully import elephants from other countries to fill their breeding needs—although it is not clear how difficult a task this might be. Nonetheless, the potential harm to the zoos from an injunction is quite significant.

### D. Public Interest

It is not clear where the public interest lies in this dispute. The zoos aver that

sustaining a viable population of African elephants in North America will serve the public interest because the public will be able to view the elephants and because such viewing will promote and encourage conservation of the world's resources. But however sensible that may seem, it may be that the public (or a substantial portion thereof) sympathizes with plaintiffs' view that zoos are improper places to keep wild animals and that the elephants are even better off culled than at these zoos.

Although preserving the lives of these eleven elephants would seem to be the publicly more acceptable outcome, the Court will not without further evidence assume that the public firmly adopts either side's perspective. Accordingly, the public interest does not strongly favor either granting nor denying the motion for a preliminary injunction.

### E. Conclusion on Balance of the Harms

Overall, balancing the harms is basically a wash—plaintiffs' interests will be advanced to some degree by granting an injunction and may be harmed irreparably from denying an injunction; the zoos' interests will be harmed significantly, although in the long term perhaps not irreparably, if an injunction is granted; and the interests of the federal defendants and the public do not cut clearly one way or another. In that setting, the most that can be said is that plaintiffs have not carried their burden on the balance of harms, since they have not shown that irreparable harm to them is certain and great absent an injunction, *see Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985), or that an injunction would not irreparably harm others (here, the zoos) and that an injunction would be in the public interest.

## VI. Conclusion

In conclusion, plaintiffs do not have a substantial likelihood of success on their claims based on the record and arguments presented at this time. Moreover, the balance of harms does not significantly favor granting an injunction. Accordingly, plaintiffs' motion for a preliminary injunction is denied. A separate order accompanies this opinion.

## *ORDER*

Upon consideration of Plaintiffs' Motion for a Preliminary Injunction, the arguments of counsel at the hearing on August 6, 2003, and the entire record, it is hereby ORDERED that the motion is DENIED for the reasons stated in the Memorandum Opinion issued on this date.